HOLLAN v. AMERICAN BANK OF COMMERCE & TRUST COMPANY.

Opinion delivered May 21, 1923.

1. USURY—BURDEN OF PROOF.—The burden is upon the party who pleads usury to clearly prove it.

2. USURY—EXCESSIVE BROKERAGE FEE.—Where a lender charged 8 per cent. interest and a brokerage fee of one per cent. on a loan for 30 days, the contract is usurious, though at the lender's op-

tion the loan was renewable without a brokerage fee at the end of that period.

3.  USURY—RENEWAL CONTRACT.—A contract is itself usurious which is executed in renewal of a usurious contract.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed in part.

*J. C. Marshall,* for appellant.

The first five mortgage loans were usurious, and the court erred in not so holding, and especially is this true of the second, third and fourth loans. 39 Cyc. 971; 135 Ark. 578; 54 Ark. 155. Renewal also usurious. 39 Cyc. 1093. The exactions by the bank officers personally for their individual benefit made the first and fifth loans usurious. 27 R. C. L. 239; 39 Cyc. 975; 63 N. W. (Minn.) 108.

*Moore, Smith, Moore & Trieber,* for appellee.

The personal gratuities given one of the bank officials did not render loans usurious, and the burden was on appellant to prove usury. 105 Ark. 653; 123 Ark. 612; 32 N. E. (Ill.) 534. Case cited by appellant, 63 N. W. 108, not applicable to facts herein. Collection of 1 per cent. brokerage did not render other loans usurious, as the loans were to be carried till automobiles could be sold. There must be an intention to take usurious interest in order to constitute usury. 25 Ark. 258; 91 Ark. 458. The notes were extended indefinitely to carry out intention of parties. 27 R. C. L. 212. Rate of interest was uncertain and could not be definitely known until loans were paid off. 56 Ark. 335; 69 Ark. 352; 118 N. E. (N. Y.) 622. Usury will not be inferred, where, from the circumstances, the opposite conclusion can be reasonably and fairly reached. 83 Ark. 31; 74 Ark. 241; 153 Ark. 219. The increase of the rate afterwards was an oversight, and certainly does not show an intention to make such charge at time loan was made. 25 Ark. 258; 67 Ark. 426; 63 Ark. 225; 138 Ark. 11.

*J. C. Marshall,* in reply.

Bank had to enter into written contract to charge over 6 per cent. interest, and writing shows intention of parties as to interest and brokerage is undisputed. 62 Ark. 370; 135 Ark. 578; 39 Cyc. 951. Cases of 64 Ark. 426, 153 Ark. 219, have no application here. 115 N. W. (Ia.) 577; 68 S. W. (Mo.) 917; 46 N. W. (Minn.) 360; 88 N. W. (Minn.) 845; 64 N. W. 898. Notice or knowledge of usurious charge is presumed where agent making loan has general authority. 45 N. W. 439. The notes sued on, except those for the sixth loan, are usurious and void, and a decree should be entered accordingly.

WOOD, J. Claud L. Hollan, hereafter called appellant, doing business under the name of Hollan Auto Company, executed certain notes to the American Bank of Commerce & Trust Co., hereafter called the appellee. We will refer to these loans as the first, second, third, fourth, fifth and sixth loans, in the order in which the notes were executed.

The first note was for $4,000 dated October 23, 1919, due in thirty days. The note contained this recital: "Negotiable and payable without defalcation or discount at the office of the American Bank of Commerce & Trust Company at Little Rock, Arkansas, with interest from date at the rate of eight per cent. per annum until paid." This note was extended from thirty days without renewal until June 23, 1920, and from the last mentioned date was extended by renewal notes each month until April 20, 1921. Two credits were made on the note, representing the proceeds of sales of cars, the balance of the indebtedness being represented by a renewal note for $1,000 executed April 20, 1921, bearing interest at the rate of 10 per cent. per annum from date until paid.

The second note was for $2,750, due in thirty days after date, at 8 per cent. per annum, bearing the recital, "negotiable and payable without defalcation or discount at the office of the appellee," etc. This note was ex-

tended without renewal from thirty days to June 6th. From the last named date it was extended monthly by renewal notes until April 3, 1921. Two credits were made upon the renewal notes, representing proceeds of sales of cars, and the balance of the indebtedness on the second loan is represented by note of April 3, 1921, for $850.

The third loan was represented by two notes, one for $2,511 and the other for $2,631, executed March 10, 1921, due in thirty days after date, bearing interest at the rate of 8 per cent. per annum from date until paid, with similar recitals as to defalcation and place of payment. The note for $2,511 was extended from thirty days without renewal until June 9, 1920, and by renewal note from thirty days thereafter until February 7, 1921. On October 13, 1920, a payment of $850 was credited on one of the renewal notes, and the original indebtedness on the note for $2,511 is now represented by a balance of $1,660, evidenced by note of February 7, 1921. The note for $2,631 was extended without renewal from thirty days until June 9, 1920, and from the last named date by renewal each month until April 9, 1921. On November 6, 1920, a payment of $881, representing the proceeds of a sale of a car, was credited on the back of one of the extension notes, and the balance of the original indebtedness on the note for $2,631 is represented by note of April 8, 1921, for $1,750.

The fourth loan is represented by a note for $2,650 executed April 5, 1920, due in thirty days after date, with interest at 8 per cent. per annum from date until paid, with similar recitals as to defalcation and place of payment. This note was extended without renewal from thirty days until June 4, and from the last mentioned date from thirty days by renewal until April 3, 1921. On June 7, 1920, and Sept. 18, 1920, credits of $850 and $900, respectively, were made on this loan, and the balance of $900 is now represented by note dated April 3, 1920, for that amount.

The fifth loan is represented by two notes of $2,000 each, executed September 20, 1920, due in thirty days, bearing interest at 10 per cent. per annum from maturity until paid, with similar recitals as to defalcation and place of payment. No payments were made upon these notes, and the indebtedness is now represented by renewal notes executed January 19, 1921.

The sixth loan is represented by two notes dated May 4, 1921, due on or before ninety days, in the respective sums of $1,235.26 and $1,200, bearing interest at the rate of 8 per cent. per annum from date until paid. These notes were never renewed.

This action was instituted by the appellee against the appellant to recover the balance alleged to be due on the above loans and to foreclose the mortgages on certain automobiles given as security. The notes and mortgages are set up and described in the complaint. The defense was the plea of usury. The appellant alleged that the loans were usurious because of interest and brokerage and bonus required to be paid by appellant to the appellee, which amounted to a greater rate of interest than 10 per cent. per annum for the use of the money loaned.

The court rendered a decree in favor of the appellee for the balance due on the several loans in the sum of $13,231.86, with interest at the rate of 8 per cent. per annum from date of the decree until paid, and foreclosed the mortgages on certain automobiles executed to secure the indebtedness to satisfy the same. From that decree is this appeal.

1. The appellant contends that the first and fifth loans were usurious, because of certain bonuses or commissions exacted by and paid to J. F. Walker as a condition upon which the loans were obtained, and a consideration therefor, in addition to the 8 per cent. interest. Concerning the first loan for $4,000, dated October 23, 1919, the appellant testified as follows: "There was no brokerage to the bank on this first loan. I did

not pay Mr. Walker a premium in getting a loan, but I did pay him $25 each for the sale of the two cars which I sold from that shipment. I had an agreement with him beforehand to do this. * * * He told me beforehand that he would charge $25 for each car. I paid the $50 on the first two. I haven't paid it on the last because I haven't sold the car. This made $50 I paid for the loan, in addition to the small items charged for exchange, stamps, and notary fee."

Walker testified concerning this as follows: "I am vice-president and treasurer of plaintiff bank, and was in 1919-20. I have had charge of the lending of money to the Hollan Auto Company for which the notes in suit were given, beginning in the fall of 1919. * * * In regard to the $4,000 of October 23, 1919, secured by King cars, he came to my office with a draft and bill of lading attached and wanted the loan. * * * I told him I would let him have the money, and so the loan was fixed up. After this he said, 'It is certainly a relief to get these cars unloaded. You are the only one that takes any interest in helping me.' He said, 'I am going to give you personally $25 out of each car sold.' I said, 'You don't owe me anything.' That was no part of the making of the loan and no part of the consideration. In April, six months later, he handed me a check for $50 and said 'That is for you individually. The bank has got nothing to do with it.' I took the check and used it. The bank got none of the proceeds."

In regard to the fifth loan the appellant testified as follows: "This deal was a little different from the others. At the time the cars came Walker refused to unload them for me; he said the banks had quit loaning money on the cars at 80 per cent. of the value. They remained on the tracks for about three weeks. I went to him several times, and he finally told me that he would loan me the $4,000 if I would pay the interest in advance and pay him something for giving the loan. I told him I wouldn't have anything to pay him with. I said, 'I

can get a $25 hat.' He said, 'All right, get that and I will.' I got the hat for him at Poe's. So he got the hat. I went out and borrowed the rest of the money to unload the cars. The interest was paid in advance. The loan was not made until four or five days after the hat was agreed on. I sent him the hat the same evening the loan was agreed to. He exacted the $25 of me, and I told him I didn't have it, and the hat was agreed on instead of the money."

Walker testified concerning this loan as follows: "He was having some trouble in handling that shipment. He wanted a fuller loan. He first applied for a $4,500 loan on the two Roamer cars, and I told him I couldn't handle it, so he went out and tried to handle it elsewhere. He came in several days later and said he couldn't raise the money. He came in a third time; that is, he met me on the street, near his place of business, and took it up with me again. He said I must help him unload those Roamers. I said, 'Claud, I can't lend you $4,500 on those cars.' He said, 'I have prospects; I think I can sell those cars. It won't be necessary to carry them very long in stock. There's demurrage piling up against me on those cars. I've got to get them out. I've got nobody else to go to but you. You have always been my friend, and I depend upon you.' He asked me what I could lend him, if I couldn't lend him $4,500. I made him a proposition I would recommend a loan of $4,000—$2,000 on each car. He said, 'Well, I'll be around in the morning. I think I can raise the balance of it.' As I started away, he said, 'I'm going to buy you a good hat.' I said, 'Don't do that; I don't expect that of you.' He said, 'If I want to do it, it ought to be all right.' So he came in the next day and fixed up the loan. There was nothing said about any brokerage or bonus of any kind, and Mr. Severson fixed up the loan, and, a day or two after that, I went home one afternoon and there was a package there from the Hub Clothing Company. I opened it. It contained a hat. Inside was a ticket, 'Compliments of Claud Hollan.'"

The above is the testimony verbatim from the record concerning the first and fifth loans. It presents a sharp conflict between appellant and Walker. While the testimony of appellant tends to prove that Walker received the $50 and the hat as a commission or bonus paid him as inducements for, or in consideration of, making the loans in addition to the 8 per cent. interest, the testimony of Walker flatly contradicts this and tends to prove that these bonuses were not in the nature of commissions paid him for making the loan, and did not enter into the consideration for the loan, and were not exacted or charged by him as a prerequisite to the loan, but, on the contrary, that they were tendered to, and accepted by, him as mere personal gratuities from Hollan after the loans were consummated.

We have often ruled that the burden is upon the party who pleads usury to clearly prove it. *Jones* v. *Phillippe,* 135 Ark. 578, and cases there cited; *Briant* v. *Carl-Lee Bros.*, 158 Ark. 62. The appellant fails to establish the necessary facts to constitute usury in the first and fifth loans, since he does not show, by a clear preponderance of the evidence, that the alleged bonuses were received by Walker as a part of the consideration for making these loans.

2. The undisputed testimony shows that on the second, third and fourth loans the appellee, through its officers and agents, by agreement with appellant, charged and collected of him, in addition to the 8 per cent. interest, a brokerage of one per cent. on the principal of the loans. The notes evidencing these loans were payable in "thirty days after date, without defalcation," etc. Appellee concedes that this brokerage, in addition to the 8 per cent. interest, would render all these notes usurious, if the contracts were that same were to be paid in thirty days. But it contends that it was not in contemplation of the parties, at the time the notes were executed, that the same were to be paid within thirty days. The appellee was permitted, over the objection of the

appellant, to introduce testimony which tended to prove that the notes were to be paid out of the proceeds of the sales of cars as the same were sold, and that until the cars were sold the notes would be renewed or extended indefinitely until that time; that it was understood between appellant and the appellee that the rate of interest would be 8 per cent. for the originals and renewals. That it was understood by Walker and the other officials of the bank that, when the appellee went into the business of financing automobile dealers, it would charge them at the rate of 8 per cent. per annum on short time paper; that the making of the original notes and renewals thereof for thirty days was for the convenience of the appellant, so that in case he sold a car within that time he would not have to pay interest for a longer period.

The appellant testified that there was no agreement that the notes were to run longer than thirty days. When he renewed them, he got more time. The original notes fixed their own maturity. There was no assurance to him that any renewals would ever be made. He just took a chance on paying out the notes by selling off the autos. He never knew in any instance how long it would take to sell them and pay the notes, but figured he could do it inside of thirty days. He did pay off the larger part of each note within that time. He also further testified concerning the renewal of notes as follows: "It has been said that it was customary to renew these loans. Mr. Walker was the man I always did business with. He was out of town when a note came due, and Mr. Rightsell stated positively, 'When this is signed for thirty days, it is thirty days; and it is with us whether we renew it or not. You will have to pay this note off.' I told him to wait until Mr. Walker got back, and he said, 'No, something will have to be done about it right away.' I paid part of the note and then renewed it." And further: "When they refused to renew the note, I went to Mr. Rightsell. He knew what the custom of the bank was. He told me that when a note is made for thirty days that is when it is due. 'We want this note paid.'

I mentioned Mr. Walker.   Mr. Rightsell said, 'Mr. Walker nothing, I am handling it now.   I want the note paid.   I am handling the note.' ''   And further in his testimony he said: ''I went to Keatts, the note teller, and he said, 'We can't renew this note, because Mr. Walker left instructions to pay it off.'   I could do nothing else about it, so I had to see some official of the bank, and I saw Mr. Rightsell.   *   *   *   Renewals didn't come as a matter of course.   Walker would tell the note teller when he didn't want anything renewed or when he did want it.   Sometimes it would be one way and sometimes another.''

Keatts testified, among other things, that he was the note teller of the bank.   The old original notes and extended notes passed into his hands about June 5, 1920. He saw they were bearing 8 per cent. interest.   He jumped to 10 per cent., knowing that he was changing the rate.   He could not say that any of these notes were bearing 10 per cent. when he began renewing them.   He took renewals because the government required that they be stamped each time they were extended.   His intention was to collect 10 per cent. every month.   *   *   * When he began taking renewals, he did it on his own initiative, and advanced the rate to 10 per cent.   It was customary for him to have Walker O. K. the renewals, but he had no instructions from him to raise the rate. He presented the notes to Walker as renewals, and Walker merely O. K'd them.

Walker testified, in regard to this, that when his bank was consolidated with the appellee, Keatts, the note teller, took charge of the renewals of these notes.   Nothing was ever said to him one way or another about what rate appellant was doing business on.   Keatts did not raise the rate of interest on Walker's direction or instruction.   It was an error of his in doing that.   A note clerk in no case is supposed to change the rate of interest on renewals without authority.   Appellant would give his note for these loans running thirty days, and the rate of interest was 8 per cent.   The notes were made

to mature in thirty days, so that he could pay them off by making the sales of the cars with as little interest as possible. Appellee notified him when the note fell due, and, if the cars were still unsold, appellee would extend for another thirty days at the same rate of interest. All renewals were supposed to be at the same rate. Some of the cars are yet unsold.

Now, conceding that the above testimony was competent and relevant to the issue of whether or not it was the intention of the appellee to charge usurious interest, we are nevertheless convinced that the clear preponderance of the evidence shows that such was its intention. The appellee can act only through its officers, and is bound by their acts in the premises. Appellee, through its officers, received of the appellant a brokerage of one per cent. on the principal of the loans in addition to the interest of 8 per cent. per annum, under a contract which on its face absolutely bound the appellant to pay the principal of the loan in thirty days. The payment of the brokerage of one per cent. was not based upon a contingency. It was taken out at the time the loan was made. Nor was the time for the payment of the notes based upon any contingency within the option or control of the appellant. Whether or not the notes would be extended or renewed when due at the end of thirty days was a matter that was wholly optional with the appellee. Extension or renewal of the notes at the end of the thirty-day period was not within the terms of the contract and binding upon the appellee. Appellant could not enforce such extension or renewal as a matter of right under the contract, if he had not sold autos at the end of the thirty-day period, but he had to appeal to the appellee for such extension or renewal as a matter of grace and favor. The appellant testified that such was the interpretation of the contracts by the officers of the bank. On one occasion, when he sought to have a note renewed, Rightsell stated that when a note was signed for thirty days it meant thirty days, and it was with the appellee whether it would renew it or not. It

is significant that none of the officers of the bank denied appellant's testimony in this respect, or asserted that appellant could have demanded an extension or renewal of the notes at the end of thirty days as a matter of right.

Therefore, we cannot agree with learned counsel for the appellee that the notes in question evidenced loans which in reality were to be paid only as cars were sold, and which were therefore made for an indefinite duration of time. As we view the oral testimony, in connection with the written contract, we conclude that a clear preponderance of the evidence proves the intention of the appellee to charge the appellant interest at the rate of 8 per cent. per annum, and one per cent. brokerage in addition thereto, on notes payable in thirty days, but which at the end of that time, at the option of the appellee, might be extended to such a time that the 8 per cent. interest and one per cent. brokerage would not exceed the lawful rate of 10 per cent. per annum. In other words, the so-called contingency for the duration of the time of payment invoked by appellee to relieve the transaction of usury was left entirely to the appellee. The law does not tolerate a contract of that kind.

The author, on the Usury chapter in 39 Cyc., p. 951, correctly declares the law as follows: "When the lender stipulates for the absolute repayment of principal and interest at the highest legal rate, and for a further profit payable upon a contingency not under the control of the borrower, the contract is usurious. Furthermore, even the chance of the lender's receiving excessive profit under the transaction or arrangement is more than the lender is legally entitled to require. * * * *A forti-ori* is the contract usurious when the contingency under which the excessive interest is payable is under the control of the lender." It could hardly be asserted, even with plausibility, that the notes in question were not to be paid at all unless, or until, the appellant sold the cars. If the payment of the brokerage had been bottomed upon a contingency of that sort, the transactions

would be relieved of usury, because that might not happen at all, or it might not happen within a period short enough to render the one per cent. brokerage plus the 8 per cent. interest in excess of the rate of 10 per cent. per annum. The payment of the interest and brokerage is not based upon any such contingency as that. On the contrary, the notes in question were made payable in thirty days *without defalcation.* And the mortgages to secure the same are subject to foreclosure upon the failure of the appellant to pay the notes within the thirty days. Foreclosure is not contingent upon appellant's failure to sell an automobile within thirty days, or in any other given time. There is in these loans no element of uncertainty, either as to the time when the notes were to be paid or as to the rate of interest and brokerage to be paid. In other words, there is in these transactions no element of uncertainty or hazard "that seems to exclude the idea of a loan of money at a usurious rate of interest."

The cases of *Reeves* v. *Ladies' Bldg. & Loan Assn.,* 56 Ark. 335, *Farmers' Savings & Bldg. & Loan Assn.* v. *Ferguson,* 69 Ark. 352, and *Briant* v. *Carl-Lee Bros.,* 158 Ark. 62, upon which the appellee relies to sustain its contention on this point, are not applicable to the facts of this record.

The fact that the original notes were partially paid, and that the balance due thereon is evidenced by renewal notes which are the foundation of this action, does not free such renewal notes from usury. The law is well settled that a contract is itself usurious which is executed in renewal of a usurious contract. "Where the original obligation is usurious, the taint attaches to all consecutive obligations or securities growing out of the original usurious transaction, and none of the descendant obligations, however remote, is free from it if the descent can be traced." See note 2 to *Person* v. *Mattson,* 1918 Ann. Cas., p. 755, and numerous cases there cited. 27 R. C. L. p. 251, sec. 54; 39 Cyc p. 1003. See

*Pickett* v. *Merchants' National Bank,* 32 Ark. 346. We conclude, for the reasons stated, that the second, third and fourth loans are void for usury, and the chancery court erred in not so holding.

3.    The appellant does not contend that the notes of May 4, 1921, evidencing the sixth loan, were usurious.

The decree of the chancery court as to the first, fifth and sixth loans is therefore correct, and is in all things affirmed. As to the second, third and fourth loans, for the error indicated, the decree is reversed and the cause will be remanded, with directions to enter a decree declaring such loans null and void, and for such other and further proceedings as may be necessary according to law and not inconsistent with this opinion.

McCULLOCH, C. J., (dissenting). This court is definitely committed to the rule if "a promise to pay a sum above legal interest depends on a contingency, and not upon the happening of a certain event, the loan is not usurious." *Reeves* v. *Building & Loan Ass'n,* 56 Ark. 335; *Briant* v. *Carl-Lee Bros.,* 158 Ark. 62.

If therefore there was a valid and enforceable contract between the parties for renewals of the notes until sales of the automobiles could be made, then there existed such a contingency as rendered it uncertain whether the rate of interest would or would not ultimately exceed ten per centum per annum, and the loans were not usurious.

The notes executed by appellant called for interest at eight per cent. per annum, they were free from usury, and the burden of proof "is upon the party who pleads usury to show clearly that the transaction was usurious." *Smith* v. *Mack,* 105 Ark. 653; *Briant* v. *Carl-Lee Bros., supra.*

Parol evidence is admissible to prove that a promissory note, legal on its face, is in fact usurious by reason of the exaction of excessive interest, but such testimony is likewise admissible to uphold the contract by showing that the excessive exaction was not re-

ceived as interest, and that usury was not intended. *Briant* v. *Carl-Lee Bros., supra.*

It was shown by a decided preponderance of the testimony that the brokerage charge was made because of the fact that the loans were intended to be renewed from time to time until the automobiles could be sold. Walker and another one of appellee's employees in the bank testified that such was the agreement, and the chancery court found in favor of appellee on that issue. They testified that such was the custom in making loans to automobile dealers; that the notes were made payable on short time (30 days) to enable dealers to make payments as cars were sold and thus to save interest, and that appellant's notes were renewed in accordance with that custom. Appellant admitted, in his testimony, that it was customary for the bank to renew his notes until he could sell his cars, and that he "understood" that he was to have a chance to sell the cars so as to pay the notes out of the proceeds. He denied, however, that there was any express agreement to that effect. The preponderance of the evidence shows that the contract was made in accordance with the custom, and the finding of the chancellor should not be overturned.

But the majority of the court say that "the contingency under which the excessive interest is payable is under the control of the lender," that appellant cannot control it, and that the contract is not relieved of the taint of usury. I do not think so. The agreement for extension was an independent contract supported by a valuable consideration, and appellant could have enforced it. No rule of evidence is violated in permitting the oral agreement to be proved, as it was an independent one, and, though contemporaneous with the writing, the proof does not vary the terms of the writing. *Weaver* v. *Fletcher,* 27 Ark. 510; *Trumbull* v. *Harris,* 102 Ark. 669.

The written contract to pay on a given date is one thing, and the agreement for extension is another. The latter is supported by a consideration, and is enforceable.

It is no answer to say that the automobiles might never be sold, and that the extensions might never end. Other principles of law would apply in such a contingency as that.

Mr. Justice SMITH concurs in these views.