CAMMACK *v*. RUNYAN CREAMERY.

Opinion delivered November 28, 1927.

1. USURY—SUFFICIENCY OF EVIDENCE.—Evidence of an agreement to pay one undertaking to make a loan of $15,000 $100 a month for services as general manager of debtor until the loan was paid in addition to 9 per cent. interest, *held* sufficient to sustain a finding of usury.

2. USURY—BURDEN OF PROOF.—The burden of proof is upon the party who pleads usury to show clearly that the transaction was usurious.

3. USURY—AGREEMENT FOR ILLEGAL RATE.—To constitute usury, there must be an agreement between the parties by which the borrower promises to pay, and the lender knowingly receives, a higher rate of interest than the statute allows for the loan or forbearance of money.

4. USURY—PRESUMPTION.—The wrongful act of usury will not be presumed or imputed to the parties, and will not be inferred, where the opposite conclusion can be reasonably reached.

5. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.— The chancellor's finding of fact will not be reversed on appeal, unless against the preponderance of the evidence.

Appeal from Pulaski Chancery Court; *John E. Martineau*, Chancellor; affirmed.

L. P. *Biggs*, for appellant.

*Moore, Gray, Burrow & McDonnell,* for appellee.

MEHAFFY, J. The appellant, plaintiff below, filed suit in the Pulaski Chancery Court against the appellee, alleging that the appellee was a corporation, and that the Pulaski Ice Company, in August, 1922, offered to employ plaintiff as general adviser and financial adviser of said company and its operations, at a salary of $100 a month for a period of two years, or until a certain

prospective loan of $15,000 was paid, provided said plaintiff would procure a loan of $15,000 to said company on the security of certain of its property. A copy of said offer is hereto attached and made part of the complaint.

Plaintiff alleged that the offer was accepted, and that plaintiff succeeded in procuring a loan of $15,000, and that said company executed and delivered to said lender its notes, aggregating $15,000, and a mortgage on its corporate property as security therefor, and received from said lender the sum of $15,000. That, upon the completion of said loan, the said Pulaski Ice Company became bound to plaintiff as set out in said offer. That the plaintiff has at all time been ready, willing and able to render service as general supervisor of said business, and stood ready at all times to render service when called on by said Pulaski Ice Company. That plaintiff has received from said company on said contract the sum of $400 in payment of his services for September, October, November and December, 1922. That no amount has been paid on said account since December, 1922.

Plaintiff then alleges that the loan to the ice company had been paid off on or about January 1, 1924, and, according to the contract, his employ terminated two years after date of said contract. That the Pulaski Ice Company is indebted to him for two years' salary, less the sum of $400, which was paid as aforesaid, leaving a total of $2,000. That the Pulaski Ice Company owned considerable property, describing same, and, about January 1, 1924, the defendant, Runyan Creamery, purchased all the assets of the Pulaski Ice Company and assumed all the liabilities of the said ice company. That the Pulaski Ice Company and the defendant, Runyan Creamery, failed to comply with §§ 4870 to 4872, inclusive, of Crawford & Moses' Digest, and as amended by act 374 of the Acts of 1913. That all of the property of the ice company was sold and transferred in bulk, otherwise than in the ordinary course of business and trade,

and was transferred and sold to the defendant without giving this plaintiff creditor ten days' notice before the sale thereof, as required by law. That the defendant, Runyan Creamery, holds all of said property as receiver, and is accountable to plaintiff as such for all property coming into its possession from said Pulaski Ice Company. He prays for judgment for $2,000, with interest at 6 per cent. per annum, and costs.

The offer attached to plaintiff's complaint is as follows:

"Little Rock, Ark., Aug. 11, '22.

"Mr. W. D. Cammack,
821 Southern Trust Building,
Little Rock, Arkansas.

"Dear sir: We desire to negotiate a loan on the Pulaski Heights company property for $15,000, payable $5,000 per year, beginning September 1, 1923. This loan to be secured by first lien on the entire property of said company. For this loan we propose to pay 7 per cent. interest per annum, plus 2 per cent. brokerage fee.

"If you can negotiate this loan for us on this basis we are willing and hereby propose to pay you $100 per month for a general supervision of the property until the foregoing loan is paid in full. It is understood, however, that, in the event that this loan is paid before the expiration of two years, you are to receive $100 per month for a period of two years anyway, but, after the expiration of the two years, the $100 per month, as herein stated, shall terminate upon the payment of the balance due on the loan.

"This proposal is made subject to immediate acceptance, and shall not be binding upon the company if, for any reason, it is not accepted by you by 1 o'clock in the afternoon of August 12.

"Yours very truly,
"Pulaski Heights Ice Co.
"By W. F. Moody, President."

Plaintiff thereafter filed an amendment increasing his demand to $2,600.

The defendant answered, denying all the material allegations of plaintiff's complaint, and alleged that the ice company borrowed from either the plaintiff or from his brother-in-law, S. L. White, or from both of them, the sum of $15,000, and delivered to S. L. White a mortgage on its property to secure said notes. That the ice company paid, in addition to the 7 per cent. either to S. L. White or the plaintiff, or both of them, a brokerage fee of three hundred dollars. That, in addition to the brokerage fee, plaintiff demanded and the Pulaski Ice Company agreed to pay plaintiff $100 per month for a period of two years, or until said loan of $15,000 was fully paid. That no employment or services of the plaintiff were contemplated, and the plaintiff rendered no services to the Pulaski Ice Company as general supervisor, financial adviser, agent, or in any other capacity, but that said $100 per month was simply an additional sum or bonus demanded by plaintiff as compensation for the use by the Pulaski Ice Company of the principal sum of $15,000. That the arrangement by which plaintiff was mentioned as financial adviser of the Pulaski Ice Company at a salary of one hundred dollars per month, was simply a cloak and a device to cover an usurious transaction. That either plaintiff was the principal lender of the money, or S. L. White was his agent, or S. L. White was the principal lender and plaintiff was his agent. That the plaintiff was not its agent. That if the Pulaski Ice Company had paid the plaintiff $100 per month in addition to interest and brokerage fee, it would have paid more than the lawful rate of interest of ten per cent. per annum upon this loan, and the defendant therefore pleads usury as a complete defense to this action.

S. L. White testified that Cammack came to him with a letter from Mr. Moody, and stated that he was figuring on negotiating a loan for the ice company on their property, located out on Pulaski Heights. That witness went into the legal phases of the transaction, and drafted a somewhat different letter from the one presented for

signature of the Pulaski Ice Company, which he understood was accepted, and he then prepared the waiver of notice of meeting of the directors, the minutes for the stockholders' meeting, the minutes for the directors' meeting, a deed of trust to be executed by witness, with a note to be executed for $15,000. Witness prepared these papers. Later the papers were presented to witness, showing that the corporate meetings had been held, and the deed of trust and note. Witness then issued his check on the People's Savings Bank for $15,000, payable to the order of the Pulaski Ice Company. Witness stated that he did not make the loan himself. That the $15,000 was furnished by the People's Savings Bank. That Mr. Cammack and witness did not borrow the money from the People's Bank. Witness did not guarantee the loan. That it was possible that Mr. Cammack made some sort of moral guaranty to the bank.

Witness then identifies the deed of trust and copies of minutes of stockholders' meeting and directors' meeting and the coupon notes. The resolutions of the stockholders were introduced; authorizing the company to issue notes and make the mortgage on the property, and also resolution that the board of directors was authorized to employ W. D. Cammack as financial adviser of the property of the company for a period of three years, at a salary of $100 a month, the employment to cease at the expiration of two years, if the company can by that time arrange to liquidate all of its mortgage or bonded indebtedness.

Minutes of the directors' meeting were also introduced, showing authority to the president of the company to make a deed of trust to S. L. White and to execute the note, and authorizing the president to employ W. D. Cammack as financial supervisor for three years at $100 per month.

W. E. Lenon testified that he is now and was the president of the People's Savings Bank in 1922. He knew the parties. That he talked to Mr. Moody, the president of the ice company; that Mr. Cammack told

him that he made that loan, and that he wished to sell it to us. That the result of the conversation with Cammack was that the bank agreed to buy it on the guaranty of himself and Mr. White. They were to guarantee it. Cammack told witness that he was going to look after the affairs of the ice company. He made the loan largely on Cammack's guaranty that it would be paid and that he was going to see that the affairs of the concern would be so operated that it would be promptly taken care of. The last note was paid January or February, 1926. Witness testified that the bank was looking to the property, and that, if the property didn't make it, for Mr. Cammack to take care of it, and that the bank would not have made the loan on the property alone.

Witness further testified that they bought the loan, which was secured by a mortgage on that property, but with the additional guaranty that it would be taken care of.

W. D. Cammack testified that he was interested in the improvements and developments in that part of town. That Mr. Moody started an ice plant. Witness discussed it with him before the foundation was well under way. He tried to sell witness stock, and they discussed the different features. He saw Mr. Moody at the bank, and Moody told him, briefly, that some of the stockholders had fallen down on him, or subscribers of stock, and that he was in need of funds. Witness displayed some interest, and lent Moody words of encouragement, and suggested that he come to the office for another conference. They went into the physical property rather closely, and it finally resulted in a statement to Mr. Moody that witness thought he could negotiate and arrange for this money that he seemed so in need of, and work out a proposition as stated in the letter. Witness did not loan this money. Never had five cents invested in it; did not guarantee the payment of it, strictly speaking, to Mr. Lenon. He did assure him, however, that he had, by action of the board of directors and stockholders of the ice plant, representation of the

company during the life of this indebtedness, and that he would stay in personal touch with it and see that he got his money. He testifies as to the reason for his handling the matter in that way. He may have stated to Mr. Lenon that Mr. White had made the loan, and that the papers were completed and passed on.

Witness had Mr. Lenon agree to take it, and had Mr. White issue a check on the People's Bank in payment of the notes. The check was only charged to Mr. White as a bookkeeping transaction. It was simply a transfer of this record. Witness had in mind at the time that the People's Bank might not take the loan, and he might be able to transfer it to some other bank, and, so long as it was in White's name, he was in a position to borrow at most any bank in Little Rock. Witness did not put five cents of his own money into the loan. He was not in a position to make any such loan. He did not guarantee to Mr. Lenon it would be paid. He represented to Mr. Lenon he was interested in the ice company; that he had mortgages on their entire property, and, in addition, had the guaranty of Mr. Moody and Mr. Stanton that $5,000 of the loan would be taken by them personally in event the company defaulted. He also told Lenon that he was in touch with and would remain in touch with the company until the obligations were taken care of. He had an idea that he might have to do some negotiations and maybe take over the management and keep it going until a deal could be worked out. Following this loan transaction he held many conferences with Mr. Moody and others up to the time Mr. Moody's interest was sold on foreclosure. He conferred with Mr. Moose, who succeeded Mr. Moody, and, at the time Moody's stock was sold, he was present, and, if it had been necessary, he would have bought the same. Moose said that it was his intention to take care of these transactions, so he did not bid for the stock.

Witness stood ready to perform many services in connection with this transaction. He had many conferences with Mr. Moody about the affairs of the ice com-

pany and the conduct of it, its sales contracts, and the general run of the business. Afterwards there was a manager put in, and witness conferred with him many weeks, and listened to his troubles, and offered words of counsel and advice, and conferred with other people, at his suggestion, about the affairs of the ice company. That he was devoting his time when called upon, and stood ready and willing at all times. He told Mr. Moose that he stood ready to refinance the company if it was necessary. He stood ready to negotiate and help out any way that was necessary in order to keep faith. The service performed for the ice company would be necessarily for the benefit of this loan, but witness conferred with the company and many people about buying stock in the company, and explained his connection with it. All of those things were naturally for the benefit of the loan, but they were also for the benefit of the ice company. The salary started concurrently with the loan. Witness was not a stockholder, and attended no stockholders' meeting. The brokerage fee of $300 was paid to the People's Bank. None of it went to White or witness. Witness discussed the affairs of the company with Moody and Moose.

W. F. Moody testified that he was the president of the Pulaski Ice Company in August, 1922. He was instrumental in organizing the company, and secured several subscriptions that were not paid, but went ahead and constructed the plant, with the understanding that these subscriptions would be paid at the time they needed the money. When the plant was completed, some of the subscriptions were not paid, and it left them financially in pretty bad shape, and witness tried then every conceivable place that he thought he might be able to get a loan on the property, without result, until he made this trade with Mr. Cammack. The arrangement with Mr. Cammack was one of the terms and condition which he made in regard to the loan. It was contemplated that Mr. Cammack would act in an advisory capacity concerning financial matters whenever he was called upon.

A financial supervisor at $100 a month was not needed by the Pulaski Ice Company after the loan was consummated. Mr. Cammack never rendered any service to the company other than in an advisory capacity. Witness felt at liberty to call on Mr. Cammack at any time.

George D. Rumrill testified, in substance, that he was the manager of the Pulaski Ice Company from December, 1922, to March, 1924. That Mr. Cammack did not offer his services as financial adviser to him. He did not attend any of the meetings of the stockholders or directors. The services of a financial supervisor were not needed during that period. Witness, after refreshing his memory, said he did have at least one conference with Mr. Cammack.

Miss E. Francis Rumrill testified, in substance, that she was secretary of the Pulaski Ice Company from the fall of 1922 to the same time in 1924, and kept its books during that time. During that time Mr. Cammack did not offer any financial advice. He did not come to the plant other than to buy ice cream. Mr. Cammack did not attend any directors' or stockholders' meetings.

I. O. Runyan testified that he bought for the Runyan Creamery a controlling interest in the Pulaski Ice Company on February 1, 1924. At that time the Pulaski Ice Company owed Mr. White on the mortgage. The last note was paid in January, 1926. From February, 1924, to January, 1926, he had control of the company. Mr. Cammack did not offer any services as financial supervisor or fiscal agent. He performed no service during that time.

The following letter was introduced, by agreement:

"Little Rock, Ark., August 12, 1922.

"Mr. W. D. Cammack,
Southern Trust Building,
Little Rock, Arkansas.

"Dear sir: I have just talked to Mr. Stanton with reference to our conversation of a few moments ago. He has agreed to indorse one of the $5,000 notes with me. In other words, then, this letter is a confirmation of our

verbal agreement of this date, wherein you agreed to negotiate a $15,000 loan on the property of the Pulaski Ice Company, secured by a first mortgage on the plant complete. The loan to bear 7 per cent. interest per annum, payable as follows: $5,000 payable September 1, 1923; $5,000 payable September 1, 1924; $5,000 payable September 1, 1925.

"In addition to the 7 per cent. interest per annum from date until paid, we agree to pay a brokerage fee of 2 per cent., or a total of $300 brokerage fee, and to pay you for general financial supervision, or as fiscal agent of the property, $100 per month for a period of two years, and thereafter until the loan aforesaid is paid in full, or until some other satisfactory arrangement shall have been made.

"Yours very truly,
"Pulaski Ice Co.,
"W. F. Moody, President."

Mr. W. D. Cammack was then called as a witness again, and stated that he thought Mr. Rumrill's memory was faulty, and that he conferred several times with him, and two instances were very distinct in his mind. One was the selling of some stock to Snodgrass & Bracy, or to some member of the firm. Witness saw those gentlemen and discussed the matter with them at length; and also there was a transaction with Shoemaker-Bale. Witness did not borrow any money from the People's Bank in connection with this transaction. The money came from the People's Bank.

The question in this case is whether the agreement or contract between the parties constituted usury. And, as contended by appellant, the burden of proof is upon the party who pleads usury to show clearly that the transaction was usurious. There must be an agreement between the parties by which the borrower promises to pay and the lender knowingly receives a higher rate of interest than the statute allows for the loan or forbearance of money, or such greater rate of interest must be knowingly reserved, taken or secured for such loan or

forbearance. And the wrongful act of usury will not be presumed or imputed to the parties and it will not be inferred where the opposite conclusion can be reasonably and fairly reached. See *Bryant* v. *CarlLee Bros.,* 158 Ark. 62, 249 S. W. 577, and cases cited there.

If the contract for service by Cammack, the agreement to pay him $100 per month, was a contract in good faith, intended as a payment for services performed and not as a device to hide usury, the contract would be valid. It would not be usurious. This, however, is a question that must be determined from all the evidence in the case.

The appellant contends that the loan was not made by him as principal, but was procured as agent of the Pulaski Ice Company. He argues that, even if it was made by appellant as principal, it was not usurious. The appellant contends that the loan was made by the People's Savings Bank, and Mr. White testifies that he did not make the loan himself, but the People's Savings Bank furnished the money.

Mr. W. E. Lenon, president of the People's Savings Bank, testified that the bank did not make the loan. They bought a loan which had already been made.

It appears that the note and mortgage were made to Mr. White, and that the bank purchased the loan, as stated by Mr. Lenon, and that neither Mr. White nor Mr. Cammack put any of their money into it. What they did was to prepare the papers as if Mr. White was lending the money; arrange with the bank to take the loan, which Mr. Lenon says had already been made, and the papers were carried to the bank, and White gave his check on the People's Savings Bank for the $15,000.

Appellant states in his brief: "Both testified they not only did not advance the money themselves, but did not even borrow the money from the People's Bank". But, as they say, the undisputed facts are that the deed of trust was drawn and the notes made payable to White; White drew his check on the People's Savings Bank to the order of the Pulaski Ice Company, and indorsed the notes to the People's Savings Bank without recourse. No

matter where the money came from, the fact remains that the ice company made its note and mortgage to White, and, on the execution of this note and mortgage, received from White the money or the check for the money. The note was for $15,000, with 7 per cent. interest, and the proof shows that, in addition to this interest, $300 was paid as brokerage fees, and that Mr. Cammack was to receive $100 per month for two years, or until the entire $15,000 had been paid by the ice company.

The appellant argues that the reasonableness of the contract must be tested by the condition existing at the time it was made, and states that Moody, the president and general manager of the ice company, had tried, as he testified, in every way to secure a loan for the company, without success. This was the condition, according to the evidence, when Mr. Cammack agreed to assist them in getting the $15,000. But apparently as a part of this transaction was the agreement to pay Mr. Cammack $100 per month, as above stated, and the letter from the Pulaski Ice Company to Mr. Cammack, introduced by the appellant, contains the following: ''If you can negotiate this loan for us on this basis we are willing and hereby propose to pay you $100 per month for a general supervision of the property until the foregoing loan is paid in full. It is understood, however, that, in the event that this loan is paid before the expiration of two years. you are to receive $100 per month for a period of two years anyway, but, after the expiration of the two years, the $100 per month as herein stated shall terminate upon the payment of the balance due on the loan.''

There is some little conflict in the testimony, but Mr. Cammack in his testimony does not claim that he performed any services, except he had numerous conferences, and not only discussed the matter with the president and manager, but had conferences with some other people, and names at least two of them. Mr. Cammack also testifies that the salary started concurrently with the loan. That he was not a stockholder, and attended no stockholders' meetings. As a matter of fact he was sim-

ply, according to the testimony, to act in an advisory capacity.

Mr. Moody, the president, was asked this question:

"Q. I will ask you if that arrangement was one of the terms and conditions which he made in regard to this loan? A. Yes; that was one of the terms under which the loan could be made."

He then said it was contemplated that he would act in an advisory capacity concerning financial matters whenever he was called upon.

When asked if a financial supervisor was needed after the loan was consummated, he stated that he did not think so. That Mr. Cammack never rendered any service other than in an advisory capacity. It is true, he testified, that he felt at liberty to call on Mr. Cammack at any time.

Mr. Rumrill, who was manager afterwards, testified that Mr. Cammack did not offer his services as financial adviser to him. That he did not attend any of the meetings of the stockholders or directors. After refreshing his memory, he testified that he did have at least one conference with Mr. Cammack.

Miss Rumrill testified that she was secretary from the fall of 1922 to some time in 1924, and that Mr. Cammack did not offer any financial advice. He did not come to the plant other than to buy ice cream. A financial adviser was not needed during that period.

Mr. Runyan testified that he bought a controlling interest in the ice company, and at that time the ice company was indebted to Mr. White on the mortgage. That he had control of the company from February, 1924, to January, 1926, and that Mr. Cammack did not offer any services as financial adviser or fiscal agent. He performed no service during that time.

Whether this contract for the services of Mr. Cammack was made in good faith and not as a payment for the loan of the $15,000 is a question of fact.

The appellant in his brief states: "Had the People's Savings Bank received the $100 per month, it might be

suggested that the transaction is tainted with usury. But the facts are that the bank made the loan. It only received the brokerage.''

The chancellor evidently found that the bank did not make the loan, because Mr. Lenon testified positively that the bank purchased the loan that had already been made. If the People's Bank did not make the loan, and Mr. Lenon testified that it did not, but bought a loan already made, then either Mr. Cammack or Mr. White made the loan, and if, as stated by appellant in his brief, it would have been tainted with usury if the People's Bank had received the $100 per month, certainly if the person who did lend the money received the $100 per month it would be tainted with usury.

The chancellor found for the defendant, and it is the settled rule of this court that, unless the finding of the chancellor is against the preponderance of the evidence, his decree will not be reversed by this court. There is no controversy or difference of opinion about the law. But whether the contract was usurious or not depends entirely upon the evidence.

And, since we cannot say that the chancellor's finding was against the preponderance of the evidence, the decree must be affirmed.