STANDARD LEASING CORPORATION *v.*
SCHMIDT AVIATION, INC. et al

78-197                                    576 S.W. 2d 181

Opinion delivered January 22, 1979
(In Banc)

*Proctor & Proctor,* by: *Richard L. Proctor,* for appellant.

*Donald F. Seay,* for appellees.

GEORGE ROSE SMITH, Justice. This case is similar to *Bell* v. *Itek Leasing Corporation,* 262 Ark. 22, 555 S.W. 2d 1 (1977), where we held, in a chancery case, that an instrument which purported to be a lease of printing equipment was in fact a financing transaction that was void for usury. In the present case the circuit judge, sitting as a jury, found as a fact that the "lease" sued upon in this case is usurious and void. Several points for reversal are urged, but the validity of the contract is the essential issue.

We state the facts most favorably to the trial court's judgment. Standard Leasing brought this suit to recover all future installments under the lease, which it had declared immediately due and payable. Standard Leasing is engaged in what its principal witness, John Coppedge, described as the leasing of all types of general equipment. Standard Leasing does not have possession of the property that it leases. Instead, it supplies sellers of equipment with its forms and instructs the vendors how to fill out a form when equipment is sold. The form, with the purchaser's credit references, is then submitted to Standard Leasing for approval. If Standard Leasing approved the transaction, it pays the seller for the equipment and executes the "lease." The trial judge could have found that the papers are then transferred to a bank or other lender. That is, Coppedge testified that its business was "funded through certain banks and funding associates that we have." He also said that the original documents in this

case were in the possession of the DeKalb County Bank. The lease itself contains detailed provisions for its assignment and ironclad restrictions against the possibility that either Standard Leasing or its assignee can be held liable for breach of warranty or for other claims that might be asserted by the purchaser of the equipment.

In this case two representatives of Grimes Oil Company, of Memphis, Tennessee, came to Jonesboro, Arkansas, in 1976 and sold an air compressor to the appellee Schmidt Aviation. The purchaser was offered the option of buying the compressor for cash or leasing it. The purchaser elected, for tax purposes, to lease rather than to buy. One of the sales representatives stated that at the expiration of the lease Schmidt Aviation could buy the compressor for 10% of the price.

The sellers used a Standard Leasing form in writing up the transaction. In most respects it is similar to the lease in *Bell, supra*. That is, the document sets forth a "price" of $2,-895.00, plus sales tax (at the Arkansas rate) of $86.85, making a total of $2,981.85. The instrument then provides for 36 monthly rental payments of $107.65, with the first and last to be paid in advance — apparently as a down payment. The monthly payments seem, mathematically, to have been arrived at by adding 30% to the total purchase price, which of course would amount to about 15% interest upon a transaction payable in 36 monthly installments.

The document, as in *Bell*, puts all the risk upon the lessee and provides the same remedies upon the lessee's default that would be available to a conditional seller or mortgagee upon a similar delinquency. The lessee also waives trial by jury and the right to interpose any counterclaim or offset against the lessor in litigation with respect to the lease or the repossession of the property. The lessee authorizes the lessor to file a financing statement where necessary to perfect a security interest in the equipment.

In *Bell* the lease was silent with regard to the purchase of the property at the expiration of the lease, but there was oral testimony that it could be bought for 10% of the price. Here the lease, contrary to the salesmen's representations, recites

that there is no option to purchase. Coppedge testified, however, that in a number of cases Standard Leasing does not get the property back, from which the trial judge could infer that in those instances the purchaser becomes the owner of the equipment when all payments have been made. To say the least, after the defendants below had made a prima facie showing that the lease was a sham, Standard Leasing made no effort to go forward with the proof by showing that it is actually engaged in good faith in the leasing of the equipment, not as acting as a broker or middleman in financing its sale.

The situation presented by this case is evidently parallel to that in *Hare* v. *General Contract Purchase Corp.*, 220 Ark. 601, 249 S.W. 2d 973 (1952). There finance companies, through the device of a pretended credit sale price, were actually financing the sale of automobiles and other products at an interest rate in excess of 10% annually. We left unimpaired the doctrine that a true credit price may be resorted to by the parties, just as we now leave unimpaired the right of the owners of equipment or other property to make bona fide leases. But we call attention to this language in the *Hare* case:

(2) If the seller, whether he has quoted two prices to the purchaser or not, subsequently transfers the title documents to an individual or company which is engaged in the business of purchasing such documents, at a price which permits the transferee to obtain more than a return of 10% on its investment, then a question of fact arises as to whether the seller increased his cash price with the reasonable assurance that he could so discount the paper to such individual or finance company. If that reasonable assurance existed, then the transaction is in substance a loan, and may be attacked for usury.

(3) When finance companies or purchasers of title paper supply dealers with a set of forms and a schedule for credit price increases, such will tend to show that the dealer had reasonable assurance that such finance company or purchaser of the paper would take the paper at such discount.

More than 10 years ago we gave explicit warning that

agreements purporting to be leases would be examined closely to be certain that they were not being used as a cloak for usurious charges. *Sawyer* v. *Pioneer Leasing Corp.*, 244 Ark. 943, 428 S.W. 2d 46 (1968). In the case at bar we hold that the testimony presented an issue of fact about whether the transaction was in truth an instance of financing rather than of leasing. We refuse to take the view that the entire transaction was purged of the possibility of usury by the insertion of a sentence declaring that the lessee had no option to purchase the property. It goes without saying that, despite that sentence, the lessor could simply permit the lessee to retain the property after he had paid the 36 monthly installments on the price. Coppedge's testimony may be taken to imply that that is what actually happens.

At the trial Standard Leasing objected, under the parol evidence rule, to the testimony of one of the salesmen that he represented to Schmidt Aviation that the property could be bought at the end of the lease for 10% of the price. It is true, of course, that the parol evidence rule would exclude that testimony if Schmidt Aviation were now seeking specific performance of the oral option to purchase. But that is not the situation. Here the issue is the true nature of the contract, and upon that issue the parties cannot convert a mortgage into a lease simply by denominating it as such. In determining whether a contract is usurious we look to its substance, not to its form. *Sparks* v. *Robinson*, 66 Ark. 460, 51 S.W. 460 (1899). For a ruling upon the precise issue now before us, holding the parol evidence to be admissible, see *McKeeman* v. *Commercial Credit Equipment Corp.*, 320 F. Supp. 938 (D.C. Neb., 1970).

Finally, we cannot sustain the argument that the contract is governed by the law of Tennessee, as the instrument recites, rather than by the law of Arkanuas. To begin with, counsel have not cited any authority holding that this transaction would be recognized as a genuine lease in Tennessee. But, apart from that, the principal significant contracts occurred in Arkansas. *See* Leflar, American Conflicts Law, § 147 (1968). The seller sent its representatives to Arkansas, where the actual sale occurred. The Arkansas sales tax was paid. The air compressor was delivered and installed by the seller in Arkansas. Efforts by the seller to repair it were made

in Arkansas. The original written contract was prepared and signed by Schmidt in Arkansas. It may have been accepted and approved in Memphis, where Standard Leasing has an office, although the testimony is not positive on this point. Schmidt, however, made the mistake of signing the original instrument both as lessor and as lessee. Standard Leasing then retyped the contract and returned it to Schmidt for re-execution. Thus the contract was finally consummated in Arkansas, though we do not regard that fortuitous fact as being of controlling importance. Essentially it was an Arkansas contract, governed by Arkansas Law.

Affirmed.

HARRIS, C.J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. In its zeal to purge the commercial temple of usurers, this court has neither abrogated nor abandoned certain essential rules pertaining to alleged usury and judicial consideration of contentions that an apparently legitimate transaction really is a cloak or device for the extraction of usurious interest, although it seems to me that on occasions, such as the one at hand, it has found it relatively easy to overlook them. I submit that the evidence in this case will not meet the severe tests for finding a facially legitimate business transaction between competent and capable businessmen to have been a cloak, shield or device for a usurious loan.

The taint of usury can only attach to a loan of money or forbearance of a debt, either in form or substance. *Haley* v. *Greenhaw*, 235 Ark. 481, 360 S.W. 2d 753; *Sloan* v. *Sears, Roebuck & Co.*, 228 Ark. 464, 308 S.W. 2d 802; *Ayres and Graves* v. *Ellis*, 185 Ark. 818, 49 S.W. 2d 1056. In other words, in order to constitute usury there must be an agreement to pay more than 10 percent per annum for the use of the money. *Citizens' Bank* v. *Murphy*, 83 Ark. 31, 102 S.W. 697. There must be an intention on the part of the lender to take more than legal interest. *Cox* v. *Darragh Co.*, 227 Ark. 399, 299 S.W. 2d 193. If neither party intends to contract for usurious interest, the law will not infer a corrupt agreement. *Jordan* v. *Mitchell*, 25 Ark. 258.

It is true that, in order to determine whether the contract is usurious, the law will look behind any device intended to evade the usury laws to determine the real nature of the transaction. *Armstrong* v. *McCluskey,* 188 Ark. 406, 65 S.W. 2d 558; *Home Building & Sav. Ass'n.* v. *Shotwell,* 183 Ark. 750, 38 S.W. 2d 552; *Dickinson-Reed-Randerson Co.* v. *Stroupe,* 169 Ark. 277, 275 S.W. 520; *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W. 2d 973. It is also true that when the manifest intention of a transaction is the loan of money, it is no less illegal because it is disguised as a sale or lease of personal property. *Bell* v. *Itek Leasing Corp.,* 262 Ark. 22, 555 S.W. 2d 1; *Sloan* v. *Sears, Roebuck&Co.,* supra; *Hare* v. *General Contract Purchase Corp.,* supra. But usury *will not* be inferred or imputed to the parties where an opposite conclusion can be fairly and reasonably reached. *Key* v. *Worthen Bank & Trust Co.,* 260 Ark. 725, 543 S.W. 2d 496; *Brown* v. *Central Arkansas Production Credit,* 256 Ark. 804, 510 S.W. 2d 571; *Hayes* v. *First National Bank of Memphis,* 256 Ark. 328, 507 S.W. 2d 701; *Davidson* v. *Commercial Credit Equipment Corp.,* 255 Ark. 127, 499 S.W. 2d 68; *Geyer* v. *First Arkansas Development Fin. Corp.,* 245 Ark. 694, 434 S.W. 2d 301; *Peoples Loan & Investment Co.* v. *Booth,* 245 Ark. 146, 431 S.W. 2d 472; *Armstrong* v. *McCluskey,* supra; *Brittian, Admr.* v. *McKim,* 204 Ark. 647, 164 S.W. 2d 435; *Citizens' Bank* v. *Murphy,* supra.

The burden of proof is upon the party who alleges usury to show *clearly* that the transaction is usurious and that the requisite intent existed. *Cammack* v. *Runyan Creamery,* 175 Ark. 601, 299 S.W. 1023; *Hogan* v. *Thompson,* 186 Ark. 497, 54 S.W. 2d 303; *Hollan* v. *American Bank of Commerce & Trust Co.,* 159 Ark. 141, 252 S.W. 359; *Jones* v. *Phillippe,* 135 Ark. 578, 206 S.W. 40; *Smith* v. *Mack,* 105 Ark. 653, 151 S.W. 431. Usury must be established by *clear* and convincing evidence, particularly where written instruments are alleged to be something other than that which they appear to be.[1] *Baxter* v.

---

[1] I am not unmindful of *Dickinson-Reed-Randerson Co.* v. *Stroupe,* 169 Ark. 277, 275 S.W. 520; *Tisdale* v. *Tankersley,* 192 Ark. 70, 90 S.W. 2d 225; and *Tisdale* v. *Maness,* 192 Ark. 465, 92 S.W. 2d 380, wherein it was held that a fair preponderance of the evidence was all that was necessary. Later cases have restated the "clear and convincing rule." All three of these cases affirmed the trial court and in each of the first two, evidence that seems to have shown clearly that there was usury was presented. The third might actually have applied the "mere preponderance" rule but cited no authority.

*Jackson,* 193 Ark. 996, 104 S.W. 2d 202; *Commercial Credit Plan, Inc.* v. *Chandler,* 218 Ark. 966, 239 S.W. 2d 1009; *Haley* v. *Greenhaw,* supra. Where the evidence is conflicting and that offered in support of the charge of usury is not *clear and satisfactory,* it is not sufficient to sustain the contention. *Simpson* v. *Smith Sav. Soc.,* 178 Ark. 921, 12 S.W. 2d 890; *Hollan* v. *American Bank of Commerce & Trust Co.,* supra; *Briant* v. *Carl-Lee Bros.,* 158 Ark. 62, 249 S.W. 577; *American Farm Mortgage Co.* v. *Ingraham,* 174 Ark. 578, 297 S.W. 1039; *Citizens' Bank* v. *Murphy,* supra; *Mente* v. *Townsend,* 68 Ark. 391, 59 S.W. 41. Because of the severely penal nature of the Arkansas usury laws, the plainest principles of justice require strict adherence to these standards. *Arkansas Real Estate Co.* v. *Buhler,* 247 Ark. 582, 447 S.W. 2d 126; *Baxter* v. *Jackson,* supra. See also, *Citizens' Bank* v. *Murphy,* supra; *Haley* v. *Greenhaw,* supra.

This case is readily distinguishable from *Bell* v. *Itek Leasing Corp.,* 262 Ark. 22, 555 S.W. 2d 1, relied upon by the majority. In *Bell,* there was a substantial initial payment which could have been considered as equivalent to a down payment. Here, the lease merely required that the first and last monthly rental payments on a lease for 36 months be made in advance. There was no "down payment" here. In *Bell,* we said that it was fair to infer that Itek Leasing Corporation financed the sale of Itek products. The majority is hard put here to say that appellant is a finance company and it certainly was not in the business of financing the sale of Grimes Oil Company products or those of any particular concern. The evidence shows that appellant leased property sold by many concerns and that, at the time of the trial, it was not leasing any property sold by Grimes. The trial judge did not find, as the majority says he might have, that the papers in the transaction are transferred to a bank or other lender. I submit that there is nothing unusual or significant about any business of any size being "funded" by loans or about a lessor's securing a loan by a lease.

In *Bell,* considerable significance was attached to the filing of a financing statement under the Uniform Commercial Code. Ark. Stat. Ann. § 85-9-408 (Supp. 1977) did not affect the transaction in *Bell.* It does relate to this transaction. It provides that a lessor of goods may file a financing statement, but that its filing "shall not of itself be a factor in determining

whether or not the . . . . . lease is intended as security." This makes quite a difference.

In *Bell*, the leasing corporation's own representative testified that the company, 30 days before the expiration of the five-year term of the "lease," would offer the lessee the option of buying the leased equipment for a nominal amount, although there were indications that the property would then have been worth $10,000. In *Bell*, the "lessee" could have purchased the equipment, originally worth $12,670, for $1,-267, after having paid $17,500 in rentals over the five-year term of the contract. There is no real comparison here. The total payments here amount to $3,875.40. The value of the property was $2,895.00. No one testified about the value of the compressor at the termination of the lease. Evidence on the question of purchase by the lessee is unsatisfactory, if it can be considered at all.

Coppedge testified on direct examination that, at the expiration of the lease, appellant sells the leased property on the open market. The testimony about lessees keeping the leased equipment at the expiration of the lease is at least subject to a reasonable interpretation different from that of the majority and I submit that it does not properly form the basis for an inference that the lessee becomes the owner of the equipment when all rental payments have been made. Nor does it imply that the lessor simply permits the lessee to retain the leased property after all rental payments have been made. The questions and answers, as appellee sets them out, were:

Q. O.K., now you mentioned a while ago when Mr. Woodruff asked you about what do you do with equipment when you get it back and your statement was if we get it back, we put it up for sale.

A. Right.

Q. What happens — are there a number of cases that you don't get the equipment back?

A. Yes.

Q. Do the Lessees buy it?

A. Sometimes, yes.

As I read this testimony, the lessor gets the equipment back and sells it on the open market, except in those cases in which the lessee buys it. Furthermore, I do not think the testimony of the representatives of the actual seller (Williams Equipment Company, which represented Grimes Oil Company in some capacity) have any bearing whatever on the question of the nature of the transaction, in spite of the fact that I agree that parol evidence is admissible to show the true nature of a contract which is alleged to be a cloak for usury. As Coppedge testified, appellant had no control over the salesman. Merely furnishing the seller with forms for a lease contract did not make it, or its salesman, a general agent of appellant (if it created an agency relationship at all), or confer authority to change the terms of the contract. Williams certainly had no authority to make statements or admissions on behalf of appellant. There was no contract until it was approved by appellant. The contract approved by appellant contained the statement that the lessee had no option to purchase. The contract also contained this statement printed in red ink just opposite the lessee's signature:

> Please note that the Vendor's salesman is not authorized to sign these forms on behalf of STANDARD LEASING CORPORATION. They will be processed by us immediately upon receipt, and upon approval applicant will be notified and our purchase order will be issued subject to the terms and conditions thereof.

According to the testimony of Schmidt himself, Williams never indicated that he represented appellant. As Schmidt put it, Williams was saying that he could sort of assist appellee in getting a "lease thing" set up with Standard Leasing if that was what Schmidt wanted to do. Schmidt said, however, that Grimes offered to sell the equipment outright.

The fact that sales tax was an element of the base price is not significant. There was testimony indicating that the sale of the property to appellant was subject to a 3% sales tax in Tennessee. In any event, if the transaction was a lease of property in Arkansas, it was subject to the Arkansas sales tax. Ark. Stat. Ann. §§ 84-1902 (c), -1903 (Supp. 1977).

I have no quarrel with the proposition that Arkansas law was properly applied in this case. I cannot accept the intimation that the parties could not have contracted under the law of Tennessee, or that the place the contract was "consummated" is not of significant, if not controlling, importance.

With the exception of *Bell*, the only other Arkansas case involving a contention that a lease cloaked a usurious loan is *Tillar v. Cleveland*, 47 Ark. 287, 1 S.W. 516. Real estate was involved. It is difficult to see how the court could have avoided holding that transaction to be a loan. The "lessee" was a clerk in the lessor's store. The clerk applied to his employer for a loan to purchase a lot and complete a house on it. When the clerk offered to pay the highest legal rate of interest, the employer said that 10% was not enough and he suggested a leasing arrangement which would assure a substantially greater return. The clerk was forced, "by his necessities, to accept" those terms.

This was not an agreement between parties whose bargaining power was not equal. Appellee was not a necessitous purchaser. The contract was a matter of choice with it. It could have bought the compressor outright, but voluntarily chose the lease because of the obvious tax advantage of treating the rents as a cost of doing business. Schmidt himself said that he leased the equipment, rather than buy it, for tax and liability benefits. In concluding his testimony, on redirect examination, Schmidt stated that he did not buy any equipment from Grimes Oil Company, but that he leased a piece of equipment from Standard Leasing. Obviously, Schmidt knew the true nature of the transaction.

This is not a case in which this court can rest an affirmance upon finding substantial evidence to support the judgment. It must find clear and convincing evidence. That evidence must do more than give rise to an inference that the transaction was different from what it appeared to be. It must be such that an *opposite conclusion could not reasonably and fairly be reached*. The evidence in this case not only does not foreclose a conclusion that the transaction was just what it appeared to be on its face, it actually supports a different conclusion. The harsh and heavy penalty of the Arkansas usury law should not be imposed on a transaction such as this.

I am authorized to state that the Chief Justice joins in this opinion.