## CAIN *v.* STACY.

### Opinion delivered November 8, 1920.

1. USURY—TAKING INTEREST IN ADVANCE.—The taking of the highest rate of interest in advance on a loan having not more than twelve months to run is not usury.

2. USURY—EMPLOYMENT OF LENDER.—Where a lender, in addition to charging the highest legal rate of interest, exacts of the borrower, as part of the consideration, that the borrower employ him for a consideration when his services are not needed and are not in fact rendered, the contract is usurious; but such an agreement would be valid if the contract was made in good faith, and the additional amount to be received was a fair compensation for services to be rendered, and was not a device to hide usury.

3. USURY—EVIDENCE.—A finding that a transaction was not tainted with usury held not against the weight of the evidence.

Appeal from Woodruff Chancery Court, Northern District; *A. L. Hutchins,* Chancellor; affirmed.

STATEMENT OF FACTS.

I. J. Stacy brought this suit in equity against W. R. Cain to obtain judgment upon a promissory note and to foreclose a mortgage given to secure the same.

The answer sets up the defense of usury. On the 15th day of May, 1919, W. R. Cain executed to I. J. Stacy a mortgage on certain chattels to secure an indebtedness of $4,000 evidenced by a promissory note bearing interest at the rate of 10 per cent. per annum from date until paid. The mortgage was given by Cain to Stacy to obtain a loan of $4,000 to be used in raising a rice crop. The parties also entered into a written agreement reciting the execution of the mortgage and agreeing that the money should be deposited with the Bank of Augusta & Trust Co., to the credit of Cain-Stacy rice account, and that no checks drawn thereon should be valid until signed by said Stacy.

It was further agreed that Stacy, if he saw fit, might take charge of the rice crop and manage the same, and that the cost thereof should be charged against the rice crop and paid out of the proceeds arising from the sale thereof. It was further agreed that in any event the said Stacy should receive a reasonable compensation for his services and that he might have the rice crop shipped in his name and ship and sell it when he so desired. During the season of growing the crop, Stacy was paid $50 per month for his services for a period of five months. Thus far the facts are undisputed.

According to the testimony of W. R. Cain, Stacy drew a check in advance in his own favor for the first six months' interest at the time the money was deposited in the bank to the credit of the Cain-Stacy rice account. The parties also agreed at that time that Stacy should receive a salary of $50 a month for five months. It was the understanding that in this way Cain would pay to Stacy 25 per cent. interest per annum for the loan. In other words, the employment of Stacy and the payment of the $200 interest in advance were for the purpose of enabling Stacy to avoid the usury laws, it being the understanding between the parties that in this way Stacy should receive 25 per cent. per annum interest on the loan. Cain did not agree to pay $50 per month to Stacy for any assistance and advice in cultivating the rice

crop. Stacy did nothing to assist Cain in cultivating the rice crop except to lend him the $4,000. Cain never saw Stacy on the farm while the rice was being grown. Cain made arrangements with a certain coal company to furnish him with coal, and when he needed coal he asked Mr. Stacy, who was one of the stockholders of the company, to call the company over the telephone and order a car of coal for him. Cain admitted that he sometimes drank to excess, but said that he drank very little during the year 1919. None of the checks drawn on the rice account were countersigned by Stacy.

According to the testimony of Stacey, he was president of the bank in Augusta in which the Cain-Stacy rice account was placed. Stacy loaned Cain $4,000 which he had borrowed for Cain from a friend in St. Louis and took a chattel mortgage from Cain to secure the debt. He required the account to be placed in the bank of which he was president and to be designated as the Cain-Stacy rice account, because he wanted to have control of checking out the same so that he might see that it was used to make the rice crop and for no other purpose. He did not sign the checks himself because he was in the bank and knew what each check was drawn for. He at all times during the season advised with Cain about the expenditure of the money and knew that each check was applied to the cost of making the rice crop. Cain had been in the habit of drinking very heavily, and Stacy thought that he would have to give him a good deal of help and advice about cultivating and gathering the rice crop. For this service he was to be paid at the rate of $50 a month for five months. It was on account of the hazard and the services Stacy was to render that Cain agreed to pay him this $50 per month.

Stacy was asked what he meant by using the word "hazard" in this connection and answered that Cain was accustomed to get drunk and was not able to supervise or work the rice crop while in this condition. Cain did get drunk a number of times during the crop season, and Stacy earned his compensation of $50 per month.

Stacy was a stockholder in a coal company and saved Cain at least $25 per car by supplying him the coal through the company of which he was a stockholder. Stacy purchased four cars of coal for Cain in this way.

The cashier of the coal company corroborated the testimony of Stacy about the purchase of the coal. Cain rented the land on which the rice crop was grown from R. B. McKnight. McKnight testified that Stacy approached him to take over Cain's rice crop if it became necessary. McKnight had seen Cain in a drunken condition frequently, but very little during the year 1919.

The chancellor found the issues for the plaintiff, Stacy, and gave judgment in his favor against the defendant, Cain. It was also decreed that the mortgage should be foreclosed. The case is here on appeal.

*E. M. CarlLee,* for appellant.

The decree, in so far as it gave judgment for the $4,000 note, is void for usury, and the finding of the chancellor that the transaction was not usurious is contrary to the clear preponderance of the evidence. The loan was for six months, and the taking of $200, the full ten per cent. allowed by law, in advance, was usury. The burden was on appellee to show that there was no usury. 55 Ark. 146. The evidence proves usury. *Ib.* The alleged services were a mere subterfuge to cover an usurious loan. 39 Cyc. 931. Testimony by parol is admissible to show that a written agreement to pay an usurious rate of interest is always admissible. 62 Ark. 98.

*J. F. Summers,* for appellee.

The allegation of usury is not only not sustained by the proof but is not tenable. Here the contract provides for valuable services which were performed, and there was no usury. The finding of the chancellor who heard all the testimony is supported by a clear preponderance of the testimony that there was no usury; and the decree should be affirmed.

HART, J. (after stating the facts). The first ground of usury relied upon by the defendant is that the notes

bore 10 per cent. interest per annum from date until paid and that the plaintiff took out $200, the first six months' interest, in advance.

In *Ellis* v. *Terrell*, 109 Ark. 69, and in *Bank of Newport* v. *Cook*, 60 Ark. 288, the court held that the taking of the highest rate of interest in advance on negotiations having not more than twelve months to run is not usury.

Another ground for the alleged usury is that by the written agreement of the parties the payment to Stacy for his services in connection with the rice crop was a contrivance between the parties by which more than the legal rate of interest was to be secured to Stacy. If Stacy exacted of Cain as part of the consideration of the loan that Cain should employ him at an exorbitant price when his services were not needed, and were not in fact to be rendered, the contract would be usurious. The form of the contract is immaterial if the intent exists at the time the contract is made to take and receive usurious interest. *Habach* v. *Johnson*, 132 Ark. 374.

In the present case, the chancellor found that the defense of usury had not been established by the evidence, and we can not say that the finding of the chancellor is against the weight of the evidence. At the time of the loan Cain was in straitened circumstances. He had rented a rice farm, and was not able to grow a rice crop without pecuniary assistance. He had the habit of getting drunk frequently, which habit was known to Stacy.

According to the testimony of Stacy, the written agreement of the parties was given as a consideration for the services of Stacy in the matter of superintending the rice crop because Cain was in the habit of frequently getting drunk. It is true that Cain did not get drunk as frequently as usual during the rice season of the year 1919, but he did get drunk several times and needed the services of Stacy in assisting him about managing the crop. Stacy said that Cain was incapable of managing the crop when he was drunk. It is true the owner of the land on which the crop was grown said that he did not

see. Stacy drunk often during the year 1919, but the reasonableness of the charge must be tested by the conditions existing at the time the contract was made. The question is whether the agreement between the parties was a contrivance by which more than the highest legal rate of interest was to be secured to the lender. The evidence shows that at the time the agreement was made Cain was in the habit of frequently getting drunk and Stacy had this in mind when he made the agreement. He knew that Cain was incapable of looking after the crop when he was drunk. Stacy felt like the hazard of lending money to a man of this character was so great that he must protect himself by knowing that every bit of the money loaned should be applied to the expense of raising the rice crop. To accomplish this purpose, he had the money deposited and the account named in the bank as the Cain-Stacy rice account. It is true he did not sign the checks, but he was president of the bank carrying the account and knew what each check was for before it was paid. Stacy also assisted Cain in other ways about the rice crop. He looked after the purchase of coal for him and in this way saved him at least $100.

According to Stacy's testimony he superintended the growing of the rice crop and rendered valuable services in that behalf to Cain. Of course, according to the testimony of Cain, the transaction was intended as a cover for the advance of money with usurious intention. According to the testimony of Stacy, however, the amount to be received by him was a fair allowance for the trouble and inconvenience he was likely to be put to in assisting and superintending the growing of the rice crop. If agreements of this kind are made in good faith and not as a device to hide usury, they are valid, even though the compensation may be greater than usually paid for like services. 39 Cyc. 931 and cases cited in notes 8 and 9.

As above stated, the chancellor found that the defense of usury should not prevail, and under the settled rules of this court his finding will not be disturbed

on appeal unless it is against the preponderance of the evidence.

Tested by this rule, we are of the opinion that the decree must be affirmed.