Commercial Credit Plan, Inc. *v.* Chandler.

4-9511                    239 S. W. 2d 1009

Opinion delivered May 28, 1951.

*Barber, Henry & Thurman,* for appellant.

*Josh W. McHughes,* for appellee.

Griffin Smith, Chief Justice. The Chancellor found that appellant's contracts with Winston G. Chandler were usurious, therefore unenforcible. We agree with this determination.

Act 111 became effective March 3, 1941, without the Governor's signature. It authorizes Industrial Loan Institutions and empowers the State Bank Commissioner to promulgate control rules and regulations.

Loan and investment companies were recognized by Act 354, of 1927, as amended by Act 109 of 1931 and 264

of 1933, but they were originally supervised by the Railroad Commission. Section 14 of the Act mentions the Morris Banking Plan—a term not defined. Enlarged powers were conferred by Act 111 of 1941. Now they may sell, discount, or negotiate bonds, notes, or other choses in action, and issue as evidence therefor investment certificates, contracts, or agreements under any descriptive name.[1]

The capital stock, surplus, and undivided profits of an Industrial Loan Institution doing business in a city of 50,000 or more shall be not less than $200,000 as to corporations organized under Act 111, but this provision is not applicable to corporations supervised by the State Bank Department at the time the legislation was adopted.

In 1940 Commercial Credit Plan, Inc., applied to the Bank Department for authority to operate as a finance corporation with a capital structure of $50,000. A permit issued Sept. 23 bears the restrictive indorsement: "Investment certificates shall not be sold to the public for cash, but will be issued solely to persons who borrow from the corporation in connection with loans made to them similar to the Morris Method".

The form of certificate given departmental approval carried an acknowledgment that Commercial Credit Plan Incorporated was indebted to the holder in the principal amount of [dollars blank], "in consideration of the purchase money note of even date and corresponding number herewith, executed by the original holder and delivered to Commercial Credit Plan Incorporated, herein, in payment for this certificate, which note is payable . . ." etc.

April 2, 1941, the corporation's attorney wrote the Bank Commissioner that he had been informed the Attorney General had issued an opinion to the effect that Act 111 was not mandatory, but that existing organiza-

---

[1] The investment certificates ". . . may bear such interest, if any, as their terms may provide, and which may require the payment to said 'industrial loan institution' of such amounts from time to time as their terms may provide, and permit the withdrawal or cancellation of amounts paid upon the same, in whole or in part, from time to time, and credit of amounts thereon upon such conditions as may be set forth therein".

tions might voluntarily place themselves within its reach. In reply the Commissioner issued the department's certificate under Act 111, dated April 30, 1941.

December 7, 1944, the corporation informed the Bank Commissioner of its desire to discontinue the issuance of certificates of investment "in connection with loans". This request was referred to the Attorney General, together with Form No. 2352, offered in substitution for Form No. 2310. The new form (approved by the department Dec. 29) omitted all references to any note. It certified that the person named was the owner of an investment certificate for the amount set out and that the certificate had been registered on the books of the corporation. The owner promised to pay the corporation the sum stipulated "in equal successive monthly installments of [dollars blank], each, beginning", etc. The corporation agreed to accept the certificate as collateral for any loan made by it to the holder, but reserved the right to refuse applications for loans "for any reason it might deem sufficient", and "upon maturity of any loans made upon the security of this certificate, Commercial Credit Plans Incorporated agrees to accept from the holder all or part of this certificate in payment of said loan". Across the left end of the certificate printed in blackface type notice was given that the security was invalid unless countersigned, "*or if in excess of $1,000*". Such certificates do not bear interest.

In its letter of Dec. 7, 1944, the corporation asked the Commissioner in unequivocal language whether it be permissible "to make loans without the necessity of issuing [investment] certificates". The department's reply approved the printed form suggested, but did not authorize loans when certificates were not issued. On the contrary, a copy of the Attorney General's letter of Dec. 19th was enclosed. The concluding paragraph is: "It is therefore my opinion that the words 'investment certificate', used in § 4 [of Act 111], are mandatory requirements in connection with loans made by these institutions".

· · · · · · · · · ·

On April 11, 1949, Winston G. Chandler applied to appellant for a loan of $959. An attached financial statement shows that it was to run for eighteen months and that $809 would be used to pay the balance on a title-retaining note for the purchase price of a Ford automobile—an obligation to Commercial Credit Corporation. An additional $150 was needed to pay insurance required by appellant. Thus, with the automobile debt-free, and money in hand for prepayment of insurance for eighteen months, appellant advanced $959 when Chandler executed his note for $1,128.24, due in eighteen months, with interest at eight percent after maturity. Concurrently an investment certificate for $1,128.24 was executed and pledged by Chandler as security for the loan.

The note mentions assignment of the investment certificate, but does not say what its value is or how it is to be paid. The note permits the lender to call for additional collateral ''if such should be deemed necessary'', and accelerates payment in the event default should occur ''on any installment on any property pledged''. The [makers] agree that the holder *''shall not be compelled to resort first to the collateral hypothecated for the payment of this note,* and [the corporation] may at its option require [any whose signature appears on the note] to pay.''

It is significant that the only instrument showing what the monthly payments were to be is the chattel mortgage, in which 18 equal monthly payments of $62.68 are set out. The only other debt reference to be found in the mortgage is a paragraph providing for insurance ''for not less than the total amount owing on said note until fully paid''. An obligation of the note is that the holder may, at its discretion, call for additional collateral when the existing security is thought to be insufficient. If it is not furnished (or if other enumerated possibilities should materialize) the note became immediately due at the option of the holder, who was empowered to sell ''said collateral at public or private sale''; nor was the holder compelled ''to resort first to the collateral hy-

pothecated for the security of this note," but it might, at its option, "require any of the undersigned to pay".

. . . . . . . . . .

In June, 1950, Chandler sued in equity for cancellation of the note and mortgage, alleging usury. In its answer appellant invoked the protection of Act 111 of 1941, insisting that the transaction was expressly sanctioned. Denial of usury was predicated upon a paragraph in the note that reads: "We agree that in the event that the amount actually loaned shall be less than the face amount herein, liability shall be for the amount actually loaned, or for any balance remaining unpaid". By way of cross-complaint judgment was sought for an alleged balance of $624.72. It was admitted that Chandler's first payment was made May 16, 1949, and that default did not occur until February 16, 1950. Although appellant's accountant agreed with Chandler in stating that the January installment was paid, and he did not contend that any other remittance was less than $62.68, this witness did testify that the aggregate of sums paid was $503.52. [Nine payments, including May through January, at $62.68 would be $564.12, or exactly half of $1,128.24 payable in 18 months].

In advancing its dual defenses appellant contended (a) that the note and mortgage were one transaction, and (b) the investment certificate was a disassociated matter.

A tabulation of interest on a partial payment basis on $959 for 18 months, computed according to formula set out in *Lyttle* v. *Mathews Investment Co., Inc.*, 193 Ark. 849, 103 S. W. 2d 47, discloses charges of $108.63 in excess of ten percent when full effect is given the note.

We agree with appellant that if all transactions had been represented by the note and mortgage, and if their execution resulted in the inclusion of an excess rate of interest in circumstances indicating mere error, as distinguished from the lender's deliberate design to exact a promise from Chandler for the payment of more interest than the law allows, there would be no usury. *Starling* v. *Hamner*, 185 Ark. 930, 50 S. W. 2d 612. But

that is hardly the case here; nor is confidence in the integrity of the transaction enhanced by the evidence offered. Appellant's assistant treasurer, who is its local manager, testified that the unpaid balance was $562.04, although the cross-complaint alleged $624.72 to be due after admitting receipt of $503.52. The two items mentioned in the cross-complaint, where judgment for the larger sum and foreclosure were asked, equal the face of the note—$1,128.24. Furthermore, this witness testified that his company was entitled to collect all installments on the investment certificate; that no payments had been made on the note, but after maturity appellant would be entitled to eight percent on it; that $959 would satisfy the note, but $1,128.24 "was put into it because we make them up to agree with the investment certificate", but the note is one thing and the certificate another—wholly separate contracts, neither [inferentially] depending upon the other.

The Chancellor was justified in rejecting this construction. Assuming, as appellant insists, that the corporation contributed its facilities as an aid to investors in systematically saving, and that lending money on the security of such accumulated payments was merely incidental, yet the fact remains that the certificate did not bear interest, and in the case at bar it was definitely tied in with the loan by conduct no reasonable person could fail to understand. The note by express language contemplated the possibility of default "on any property pledged," then authorized the holder to disregard hypothecated collateral, (in this case the certificate) and look to the makers or indorsers.

The test here is whether the borrower promised to pay a greater rate of interest than the law permits, and the lender knowingly entered into a usurious contract, intending to profit by the methods employed. Usury will not be presumed, *Cammack* v. *Runyan Creamery,* 175 Ark. 601, 299 S. W. 1023, and where one resists payment of a *prima facie* obligation on the ground that the contract is tainted with usury, such defense must be established by clear and convincing evidence. *Baxter* v. *Jackson,* 193 Ark. 996, 104 S. W. 2d 202.

We have held that collateral contracts entered into contemporaneously with a contract for the lending and borrowing of money, where the collateral agreement is in itself lawful and made in good faith, will not invalidate the contract for the loan of money as usurious, although its effect might be to exact more from the borrower than the sum which would accrue to the lender from a legal rate of interest. *Hogan* v. *Thompson,* 186 Ark. 497, 54 S. W. 2d 303. But it is equally well settled that where, as here, the primary purpose is to lend money through multiple transactions devised to cloak the real intent to collect excessive interest, courts will analyze the scheme and ascribe to it the contemplated purpose, disregarding as preconceived emergency defenses such language as that found in appellant's note limiting recovery to the actual amount loaned.

Affirmed.

Mr. Justice McFADDIN and Mr. Justice MILLWEE, concur.