A. L. SOSEBEE ET AL *v.* RAYMOND T. BOSWELL,
TRUSTEE FOR BLAYLOCK INVESTMENT CORPORATION

5-4142                                414 S. W. 2d 380

Opinion delivered April 24, 1967
[Rehearing denied May 29, 1967.]

*Young & Rosteck;* By *O. M. Young* and *Smith, Williams, Friday & Bowen;* By *George Pike Jr.,* for appellant.

*Griffin Smith,* for appellee.

GEORGE ROSE SMITH, Justice. This is a foreclosure suit brought by the appellee Blaylock Investment Com-

pany to enforce a deed of trust securing a loan made by Blaylock to the three appellants, Dr. and Mrs. Sosebee and Valley View Developers, Inc. The chancellor rejected the borrowers' plea of usury and entered a decree of foreclosure. Inasmuch as we find that the testimony of Blaylock's own witnesses establishes a clear-cut case of usury we need discuss only that issue.

For several years before the loan was made in 1965 the Sosebees, acting through the Valley View corporation, had been attempting to develop a residential addition to North Little Rock. The venture was in serious financial trouble, with materialmen and other creditors pressing their claims. The Sosebees applied to Blaylock Investment Company, a loan broker, for a loan of $118,-000, of which $78,700 was to be used to pay creditors and the remaining $39,300 (which was never actually advanced) to develop and sell 51 lots in the subdivision. Blaylock refused to lend any money to Sosebee for construction purposes, because it believed him to be an incompetent builder. It did agree to finance the development and sale of the 51 lots, which it considered to have a value of about $223,000. The parties expected all the lots to be sold during the three-year life of the loan.

William G. Cooksey, Blaylock's Arkansas manager, testified that the company did not think the interest upon a subdivision loan such as this one to be a great enough return for the risk involved. Moreover, Blaylock itself did not make long-term investments in such loans: "All of our loans wind up with institutional investors." Hence, before closing the Sosebee loan, Blaylock sought (a) an institutional investor and (b) an opportunity to make for itself a profit in addition to whatever interest might be involved.

Both objectives were accomplished. Blaylock obtained a firm written commitment from Standard Life & Accident Insurance Company by which Standard agreed to purchase the $118,000 loan. Standard was to

receive a 1% commitment fee from the borrowers, and Blaylock was to receive a 1% service charge from them —both items admittedly being chargeable as interest. The loan, bearing interest at 6% per annum, was payable over a period of three years in three equal principal installments.

Blaylock also procured from the Sosebees a side contract (called an Escrow Agreement) by which Blaylock expected to increase its profit. The pivotal question in the case is whether that additional profit must be treated as interest. If so, the loan was usurious; otherwise not.

The Escrow Agreement was in the form of a letter, addressed to Blaylock, which the Sosebees and Valley View were required to sign. The agreement is so hard to summarize accurately that we quote its essential provisions:

"In consideration of your . . . procuring for the undersigned the sum of $118,000.00 in development financing and your undertaking to provide permanent FHA and/or VA financing for residences to be constructed upon the captioned lots, which undertaking shall include your finding the necessary funds, processing the applications for FHA and/or VA loan, and when approved by The FHA and/or VA and your investors the closing of such mortgage loans, the undersigned [do] hereby agree . . . to place in escrow with you at the time each lot . . . is released from the blanket $118,000.00 mortgage covering such lot, the sum of $150.00 for each such lot. If the builder of a residence upon the respective lot closes his permanent FHA and/or VA financing upon said lot through your company, after approval of the property and borrower by the investor and the FHA and/or VA, the said sum of $150.00 shall be refunded to the undersigned when such respective loan is closed. It is understood and agreed that you shall make such mortgage loan after approval of the borrower and the property

for such loan by the FHA and/or VA and your investor, at your then going discount rate, but not to exceed the discount and other charges then in force and charged by Federal National Mortgage Association in the purchase of such mortgage notes.

"As to the monies escrowed attributable to any lot, if permanent financing relating to such is not closed through your company within three (3) years from date hereof, such monies are to be forfeited to you as liquidated damages, processing fees, and refund of legal charges and expenses incurred and to be incurred by you. This forfeiture to be complete without notice or the necessity of demand by you; upon failure of the events hereinabove set forth to occur within the time limit set forth. The said forfeited liquidated damages to be applied and disbursed by you without accounting to the undersigned in any manner . . . in your uncontrolled discretion, it being agreed, however, that upon the happening of either event the undersigned shall have no further or additional liability arising out of this agreement. The closing of a loan through the facilities of another lender, except for short term construction loans, shall be cause for immediate forfeiture of the fee applicable to a given lot without regard to the time element specified above.

"Should, on any date prior to maturity, the development loan be prepaid in a lump sum payment then the undersigned [do] hereby agree . . . to place in escrow with you at the time the mortgage is retired in full the sum of $150.00 for each individual lot covered by the mortgage on the date of prepayment. The final disposition of these escrowed funds shall be made in exact accord with the provisions applicable to releases covering individual lots."

This Escrow Agreement is to be tested by two well-settled principles: First, any profit exacted by the lender must be treated as interest if it depends upon a con-

tingency not within the control of the debtor. As we said in *Hollan* v. *American Bank of Com. & Tr. Co.*, 159 Ark. 141, 252 S. W. 359 (1923) : ''When the lender stipulates for the absolute repayment of principal and interest at the highest legal rate, and for a further profit payable upon a contingency not under the control of the borrower, the contract is usurious. Furthermore, even *the chance* [our italics] of the lender's receiving excessive profit under the transaction or arrangement is more than the lender is legally entitled to require. * * * *A fortiori* is the contract usurious when the contingency under which the excessive interest is payable is under the control of the lender.''

Secondly, the moneylender cannot impose upon the borrower charges that in fact constitute the lender's overhead expenses or costs of doing business. Such outlays are fundamentally for the lender's benefit and cannot, by whatever device, be shouldered off upon the borrower. On this point our recent decisions are unequivocal. *Strickler* v. *State Auto Finance Co.*, 220 Ark. 565, 249 S. W. 2d 307 (1952); *Winston* v. *Personal Finance Co.*, 220 Ark. 580, 249 S. W. 2d 315 (1952).

The Escrow Agreement manifestly flouts both principles. These borrowers had not even a semblance of control over the contingency that would avoid the forfeiture of each $150 deposit. On this point the appellees make this assertion in their brief. ''It should be pointed out here that all Sosebee had to do to avoid forfeiture of the $150 per lot was to send the customers to Blaylock and have Blaylock make them a loan.'' The short answer to this twofold suggestion is that both possibilities were patently beyond Sosebee's control. Sosebee's responsibility to the moneylenders was that of selling lots. It did not lie within his power to compel the purchaser of a lot to apply to Blaylock for a loan.

Again, even if the purchaser did elect to seek a Blaylock loan Sosebee had no voice in the lender's deci-

sion to approve or disapprove the application. In the first paragraph we have quoted from the Escrow Agreement it is stated no fewer than three times that each loan must be approved by Blaylock's investor. At the oral argument counsel for the appellees insisted that Blaylock was contractually bound to make a loan to any purchaser whose credit rating was acceptable. True, but all that assertion really means is that Blaylock promised to do business as usual, making only such loans as any other similar lending agency would have been equally glad to make. It is significant that Blaylock offered no discount, financial advantage, or other inducement for its supposedly valuable promise to provide long-term financing for those who bought lots in Valley View Subdivision.

The Escrow Agreement likewise runs counter to the rule that the lender's overhead expenses cannot be foisted off on the borrower as something other than interest on the loan. The contract, quoted above, declares that the escrow deposits are to be forfeited as "liquidated damages, processing fees, and refund of legal charges and expenses incurred and to be incurred" by Blaylock. Blaylock's manager, Cooksey, came up with this lame explanation: "The $150.00 is a fee that we have determined from past experience that would cover our expense and justify us committing ourselves for a period of three years. . . We, of course, have to maintain our office and our staff. We have to contact banks for verification of applicants' deposits, many cases the employers." In short, Blaylock had overhead expenses that stemmed not from Sosebee's duty to sell lots but from its own business of lending money.

Especially pertinent to the issue of usury is the third paragraph that we have quoted from the agreement. Here Blaylock guaranteed to itself its profit of $150 a lot even if the loan made by its investor should be prepaid in full before any lots were sold and thus before Blaylock had incurred any risk or any expense.

If the prepayment were accomplished by a refinancing of the debt, the new mortgagee, according to the appellees' reasoning, could have legally exacted from Sosebee precisely the same Escrow Agreement that Blaylock required. In that event Sosebee would have been unconditionally bound to pay $150 a lot to one lender or the other, and often to both, since it would not be possible for both lenders to finance the improvement of a particular lot. Similarly, if all the lots were bought by a single purchaser who paid cash for the property, thus liquidating the Sosebee loan, Blaylock would pocket $150 a lot without having lifted a finger to earn it.

The appellees argue in their brief that the transaction was shielded from usury by the forfeiture's being contingent. They say: "Forfeiture was contingent on non-compliance [on Sosebee's part]. The presence of a contingency eliminates any aspect of usury. *Dunbar* v. *State Building & Loan,* 171 Ark. 232, 284 S. W. 2d [1926]." This statement is much too broad. In the first place, the insertion of the contingency itself may be a cloak for usury, as in *Doyle* v. *American Loan Co.,* 185 Ark. 233, 46 S. W. 2d 803 (1932). Secondly, the *Dunbar* case, relied on by these appellees, involved a loan made by a *bona fide* building and loan association. We distinguished such transactions in *O'Brien* v. *Atlas Finance Co.,* 225 Ark. 176, 264 S. W. 2d 839 (1954), where we bottomed our decision upon an observation that applies equally well to the Escrow Agreement now before us: "If this transaction is not usurious, then any transaction can be dressed up so as not to constitute usury although it would be clear that it was merely a scheme to evade the usury laws."

The decree must be reversed and the cause dismissed.

HARRIS, C. J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. This appeal comes from a decision of the chancellor that the transaction did not constitute usury. We must, in order to

reverse, say that his findings of fact were clearly against the preponderance of the evidence, or that the evidence viewed in the light most favorable to appellee, shows that the transaction was usurious as a matter of law. I do not agree that either situation prevails.

This court has not abrogated the rule that the burden of proof is upon the party who pleads usury to show clearly that the transaction was usurious. *Wallace* v. *Hamilton*, 238 Ark. 406, 382 S. W. 2d 363; *Smith* v. *Mack*, 105 Ark. 653, 151 S. W. 431; *Jones* v. *Phillipe*, 135 Ark. 578, 206 S. W. 40; *Briant* v. *Carl Lee Bros.*, 158 Ark. 62, 249 S. W. 577. The defense of usury against payment of a prima facie obligation must be established by clear and convincing evidence and not by mere preponderance. *Hollan* v. *American Bank of Commerce & Trust Co.*, 159 Ark. 141, 252 S. W. 359; *Baxter* v. *Jackson*, 193 Ark. 996, 104 S. W. 2d 202; *Commercial Credit Plan* v. *Chandler*, 218 Ark. 966, 239 S. W. 2d 1009.[1] This rule has been modified only in cases where the lender includes some hidden and unitemized charge in the transaction. The burden is upon the lender to satisfactorily explain the hidden item. *Universal CIT Corporation* v. *Lackey*, 228 Ark. 101, 305 S. W. 2d 858. Usury will not be presumed, imputed or inferred when the opposite conclusion can reasonably be reached. *Cammack* v. *Runyan Creamery*, 175 Ark. 601, 299 S. W. 1023; *Hill* v. *Jacobs*, 187 Ark. 1162, 60 S. W. 2d 564; *Brown* v. *Fretz*, 189 Ark. 411, 72 S. W. 2d 765; *Brittain* v. *McKim*, 204 Ark. 647, 164 S. W. 2d 435.

There is no hidden or unitemized charge in this case. All dealings were open and above board. Dr. Sosebee

---

[1] I am not unmindful of *Dickinson-Reed-Randerson Co.* v. *Stroupe*, 169 Ark. 277, 275 S. W. 520; *Tisdale* v. *Tankersley*, 192 Ark. 70, 90 S. W. 2d 225; and *Tisdale* v. *Maness*, 192 Ark. 465, 92 S. W. 2d 380, wherein it was held that a fair preponderance of the evidence was all that was necessary. Later cases have restated the "clear and convincing rule". All three of these cases affirmed the trial court and in each of the first two, evidence that seems to have shown clearly that there was usury was presented. The third might actually have applied the "mere preponderance" rule but cited no authority.

knew exactly what the transaction was. However reluctant he may have been to make the agreement, he was not overreached in the dealings. A collateral contract required by a lender entered into contemporaneously with a contract for lending and borrowing of money where the collateral agreement is itself lawful and made in good faith, does not invalidate a contract for loan of money as usurious, although the lender might gain some advantage or the effect might be to exact more from borrower than would accrue to lender from a legal rate of interest. *Hogan* v. *Thompson*, 186 Ark. 497, 54 S. W. 2d 303; *Leavitt* v. *Marathon Oil Co.*, 186 Ark. 1077, 57 S. W. 2d 814; *Commercial Credit Plan* v. *Chandler*, 218 Ark. 966, 239 S. W. 2d 1009. The position which a court of equity should take is well stated in the affirmance of a decree finding that a transaction was in good faith and not usurious in *Johnson* v. *Chicot Bank & Trust Co.*, 128 Ark. 640, 194 S. W. 29:

"* * * Even if it be found that Simms took advantage of the necessities of the Johnsons to drive a hard bargain, and purchased the land at less than its true value, it does not necessarily follow that the transaction was usurious, but on the other hand, if the testimony showed that the conveyance of the land at a grossly inadequate price was merely a scheme to disguise an usurious transaction, then a court of equity should look through the form of the transaction to the substance and declare it to be void."

Unquestionably this court has always scrutinized suspicious transactions that might constitute covers to conceal usurious interest in order to determine the true nature of the transaction. *Hartz* v. *Wilson*, 205 Ark. 965, 171 S. W. 2d 956. This court has been most reluctant in these cases to overturn decisions of chancellors involving determinations whether the lender acted in good faith or the transaction was a cloak for usury as pointed out in *Griffin* v. *Murdock Acceptance Corp.*, 227 Ark. 1018, 303 S. W. 2d 242.

A contract requiring payment for services rendered and not exclusively for money advanced is not usurious. *Ayers & Graves* v. *Ellis,* 185 Ark. 818, 49 S. W. 2d 1956. A contract for payment of a commission of 1½% of the amount of notes and invoices given a bank against which the bank advanced money to a mill company at 10% interest by credit to its account was held to be for compensation for services and trouble in keeping the account in this manner for the mill company and not to render the loan usurious. *Citizens Bank* v. *Murphy,* 83 Ark. 31, 102 S. W. 697.

Notes and mortgage given to cover money and merchandise to be furnished by payee with interest at 10% per annum, was not rendered usurious by agreement that payee would charge a commission of 10% for the first year and 20% for the second year on the price paid by him to jobbers and wholesalers on merchandise furnished the maker by him, if made in good faith for securing a profit on the goods and not to evade the usury laws. *Briggs* v. *Steel,* 91 Ark. 458, 121 S. W. 754.

In *Leavitt* v. *Marathon Oil Company,* 186 Ark. 1077, 57 S. W. 2d 814, the collateral contract required was a lease of a filling station, bulk sales station and equipment worth $7,500.00 by borrower to lender for $1.00 per month. The transaction was held not usurious in the absence of a corrupt agreement between the parties making the lease a device or cloak for usury which the lender intended to exact and the borrower to pay.

An agreement between a cotton factor and cotton planters by which the former was to loan substantial sums of money at 10% per annum to the latter to enable them to make a cotton crop and the latter were to ship at least 200 bales of cotton which factor was to undertake to sell or to pay $1.25 per bale liquidated damages for each bale less than the required number was held not to make the transaction usurious. *Blackburn* v. *Hayes,* 59 Ark. 366, 27 S. W. 240. Such an ar-

rangement was held to be valid even where a contention was made that the cotton was not being sold at the highest market price. *Scott* v. *McCraw, Perkins & Webber Co.,* 119 Ark. 133, 177 S. W. 901. The same result was reached when the agreement required a bank to ship one bale for each $10.00 advanced. *Allen-West Comm. Co.* v. *Peoples Bank,* 74 Ark. 41, 84 S. W. 1041.

An agreement requiring that straitened rice farmer pay his lender a salary for assistance and advice about cultivating and harvesting a rice crop for which money was loaned was held in good faith and valid. *Cain* v. *Stacy,* 146 Ark. 55, 225 S. W. 18.

Appellee is trustee in a deed of trust to secure the payment of an indebtedness of appellants to Blaylock Investment Corporation, a firm of mortgage bankers, approached by Dr. Sosebee on behalf of appellants. As mortgage banker, Blaylock is not really a money lender. Its normal procedure is to approach an institutional investor on a proposed loan for a commitment from the investor to purchase the loan at some future date. Blaylock then loans the money to the borrower on the terms agreed upon for the commitment in order to expedite the deal. In this case a firm commitment was obtained from Standard Life and Accident Insurance Company to purchase the loan on or before May 15, 1966. The purpose of Blaylock in making this type of loan at all was in order to promote its usual business—that of handling loans on individual residences, just as the purpose of the cotton factors in the cases above cited was to promote their usual business of selling cotton. Blaylock would not have made any subdivision loan at any interest rate if they were not going to get at least an opportunity to get the home owner loans. They sought and obtained an advantageous agreement insuring solicitation on their behalf by appellants and guaranteeing themselves an entree to prospective lot purchasers for the placing of individual home loans.[2] In order to in-

[2]Blaylock also placed these loans with institutional investors and received a fee from them for doing the collecting and bookkeeping, amounting to from one-fourth to one-half of one per cent

sure performance, they provided for liquidated damages, just as the cotton factors did. They did not require the payment of this amount until a lot was sold and the liquidated damages were to be returned to appellants if Blaylock actually handled the permanent financing for a residence constructed on the particular lot. Blaylock's undertaking was to provide FHA or VA financing by finding the necessary funds, processing the applications and closing the loans approved by FHA and VA. Such loans were to be at the going discount rate, not to exceed discount rates and charges then charged by Federal National Mortgage Association in the purchase of notes. The only requirement was that the borrower and property meet the requirements for the loan by the FHA or VA and the investor whose funds were obtained by Blaylock. This is a service which requires some care and skill and knowledge of the money market and available investors. It would definitely be an advantage to lot purchasers, most of whom would not have the slightest idea about obtaining this type of financing. It should be a matter of common knowledge that there are times when our economy is such that loans of this type become difficult to obtain. A guaranteed source of this financing would naturally promote the sale of lots,[3] and each purchaser would be informed of Blaylock's undertaking. If only 14 of 51 lot purchasers obtained their loans through Blaylock, the transaction could not possibly, under any construction, result in the payment by appellants under both the loan and the collateral agreement of an amount in excess of 10% per annum on the loan.

I submit that the only fact question for the court below was whether or not the collateral agreement was entered into in good faith. No one contends that it is

of the interest paid on the loan. They would also receive a fee of 1% of the loan at the time it was placed.

[3]For some reason appellee had five houses on other property for sale which he "could not close" and on which he unsuccessfully tried to borrow money from Blaylock. Blaylock's vice president said that the money market as to government insured loans had been in a state of turmoil for about six months.

in and of itself illegal. I do not see how it can be said that the chancellor's finding is clearly against the preponderance of the evidence. I also submit that the agreement cannot be considered usurious because of the fact that it is not obvious or apparent that more than 10% of the amount of the loan would be paid as interest on the note and liquidated damages under the contract. In this I do not agree with the majority's application of some of our earlier decisions.

I contend that the holding in *Dunbar* v. *State Building & Loan Association*, 171 Ark. 232, 284 S. W. 2, is applicable and requires a holding for appellant.

"The test laid down by this court to determine whether a loan of money by a building and loan association to a stockholder therein is usurious and void is to ascertain whether the contract is an unconditional agreement to pay more than 10 per cent per annum for the use of money, or whether an agreement to pay more is dependent upon a contingency. Before the agreement can be characterized as usurious, a contract to pay more than 10 per cent per annum for the use of money by a stockholder therein must depend upon the happening of a certain event. If dependent upon a contingency, the agreement is not such a usurious contract as is inhibited by our Constitution and law. *If there is an element of uncertainty and hazard in the contract relative to the amount of interest to be paid, this contingency excludes the idea of usury in the agreement.*" [Emphasis mine]

Here is the application there made:

"In the contract before us it is clearly provided that Annie Spears Dunbar should receive, in the settlement of her loan, her full share of the profits which the association might earn during the period her stock was maturing. Although she was required to pay a small amount as interest in excess of 10 per

cent per annum, the interest payments, had she made them, would have automatically been reduced by earnings of the association upon her monthly payments in case of a full performance of the contract on her part. Just what interest she might have paid under the contract had she matured her stock and liquidated her loan by a surrender thereof cannot be computed, as the time her monthly payments were to continue was dependent upon the maturity of her stock through the payment of dues and the net amount earned on her monthly payments. If loaned out immediately and continuously, the monthly interest payments might have been compounded for her benefit many times. *This element of hazard or contingency in the contract* eliminated any usury from the agreement.'' [Emphasis mine]

The contingency there was certainly not under the control of the borrower. This rule is not altered in the slightest by the holding in *Doyle* v. *American Loan Co.*, 185 Ark. 233, 46 S. W. 2d 803. To the contrary, it is recited as a well settled rule. It was said to be equally well settled that a merely *colorable* contingency or hazard would not prevent excessive interest charges from being usurious. There the loan was for six months and the maximum 10% was withheld. The contingency was that borrower would not have to pay if he died or suffered permanent and total disability, loss of eyesight, loss of a hand or foot, or damage of more than 50% to his household furniture. The court held this to be a cloak or device for usury *because the lender was not an insurance company*. A more obvious device could not be found. Had the lender been an authorized insurer, the transaction would not have been usurious. Blaylock is engaged only in the business of rendering the services called for by the escrow agreement in this case.

I cannot agree that the decision in *O'Brien* v. *Atlas Finance Company*, 223 Ark. 176, 264 S. W. 2d 839, limited legal, bona fide collateral agreements to building and loan associations. Such a limitation would be unconscionably, and probably unconstitutionally, discriminatory.

There the borrower was actually paying his loan in monthly installments by paying on an investment certificate issued by lender at 2% interest. No such transaction is involved here. This transaction is much more comparable to the building and loan association practice than to the investment certificate of certain finance companies.

Neither can I agree with the application of *Hollan* v *American Bank of Comm. & Trust Co.*, 159 Ark. 141, 252 S. W. 359, by the majority. The language quoted therefrom in its opinion is an excerpt from a textbook and all except the last sentence is dictum. The last sentence was correctly applied, but the earlier part is contrary not only to earlier cases, but to *Dunbar* v. *State Building & Loan Association*, 171 Ark. 232, 284 S. W. 2, a case decided three years later. I submit that the actual *holding* in the *Hollan* case is consistent with that of the *Dunbar* case. Hollan was an automobile dealer. The bank contended that a note bearing 8% interest payable thirty days after date was not rendered usurious because of a 1% brokerage charged, since it was contemplated that the maturity would be extended if the borrower had not sold enough cars to pay the note. The court held that the clear preponderance of the evidence was against the bank's contention. The court said that the payment of *the 1% brokerage was not based upon a contingency,* having been taken out when the loan was made. It added that the *time* for payment was not within the option or control of the borrower but that extensions and renewals were wholly optional with the lender and a matter of its grace and favor. The language of a textwriter should not supersede the decisions of our own court. Dr. Sosebee and Valley View certainly could not force any purchaser to go to Blaylock but there certainly would have been an excellent opportunity for solicitation by them. On the other hand, Blaylock could not turn down any borrower who could meet reasonable credit and security requirements. The contingency, then, was not subject to control by the lender, and it seems to me that appellants did have some control over it.

The vice president of Blaylock explained how the

amount of $150.00 per lot was selected. It is an amount determined from past experience which would cover their expense in committing themselves to obtain or maintain institutional investors who would accept the permanent residential loans, even in tight money markets, over a period of three years and to process loan applications by unsuccessful applicants for which Blaylock would not otherwise be compensated. This is something different from a service charge for overhead expense on a loan actually made as was the situation in *Strickler* v. *State Auto Finance Co.*, 220 Ark. 565, 249 S. W. 2d 307 and *Winston* v. *Personal Finance Co.*, 220 Ark. 580, 249 S. W. 2d 315. Blaylock did not include any of its overhead expense connected with this loan in arriving at the $150 figure, nor does it seek to require appellant to bear that burden.

How can we say that there is a clear or even fair preponderance of evidence that the conclusion reached by the chancellor is one that could not reasonably be reached?

Possible usury based upon a collateral contract not consummated and upon which suit was not brought is not a defense to an action for the amount of money loaned and for foreclosure of the mortgage securing it. *Mitchell* v. *Day*, 193 Ark. 942, 104 S. W. 2d 198. This is another reason why the chancellor should be affirmed, as this case is strikingly similar. In the *Mitchell* case, the lender agreed to loan $2,000.00 at 8% upon the security of a mortgage on certain land, if borrower would deed him another tract of land. Lender advanced $983.63, but refused to make further advances because of defects in borrower's title to the mortgaged property and returned the deed to the other property. Thereafter, upon borrower's ultimate refusal to perform, lender brought suit on the note and to foreclose the mortgage. Here, appellee seeks only to have judgment for the amounts actually advanced and no recovery is sought on the collateral agreement. The contract here was never consummated in the sense of the above holding. Appellant wholly failed

to furnish the required payment and performance bond for the work of certain contractors worded to protect the lender's priority and to insure that necessary development of the lots be accomplished. All parties knew that this development was necessary in order for appellants to be able to retire the loan. Only three lots were sold before acceleration of the debt, so only three deposits against liquidated damages were made. Thus the contract was not consummated. While I find no definition of the word "consummate" in the Arkansas cases, the facts in the *Mitchell* case clearly indicate that court had in mind the definition given in Black's Law Dictionary and supported by most of the authorities listed under the definition in Words and Phrases. It is:

"To finish by completing what was intended; bring or carry to utmost point or degree; carry or bring to completion; finish; perfect; fulfill; achieve."

To consummate a contract is to carry it to its ultimate completion. *Schulman* v. *City of New York*, 178 Misc. 593, 35 NYS 2d 100.

Since the majority do not reach the question of propriety of acceleration of the debt, I will not discuss it at length. It is sufficient to say that both the failure to furnish payment and performance bond protecting the lender's priority and insuring the development of the property constituting the security as required by the security instrument and the failure to pay interest when due have adequate evidentiary support.

I would affirm the decree of the trial court.

I am authorized to state that Harris, C. J., joins in this dissent.