## AMERICAN INSURERS LIFE INSURANCE COMPANY ET AL v. J. E. REGENOLD

5-4297 423 S. W. 2d 551

### Opinion delivered January 22, 1968
[Rehearing denied February 26, 1968]

*Patten & Brown & E. J. Butler,* for appellants.

*E. J. Bell* and *Oscar Fendler,* for appellee.

GEORGE ROSE SMITH, Justice. In 1960 the appellee's father, E. M. Regenold, lent $17,892.23 to the principal appellant, American Insurers Life Insurance Company, to enable that company to avert the foreclosure of a mortgage upon 4,495 acres of farm land owned by American Insurers in Mississippi. The elder Regenold gratuitously assigned the contract to his son, who brought this suit to enforce a provision in the contract by which the lender was to receive, in addition to interest at the rate of 6% per annum, one-half of the net proceeds accruing from the ultimate sale of the Mississippi lands. The defendants, American Insurers and several of its officers, attacked the validity of the provision in question on the ground that it made the loan agreement usurious. The chancellor rejected that defense and awarded the plaintiff a judgment for $110,538.96, with interest bringing the total to $127,-702.47. The pivotal issue here is that of usury.

Except for a dispute about the value of the Mississippi lands when the contract was made, there is hardly any real conflict in the testimony. From a record of almost 2,000 pages we winnow the pertinent facts.

Noble Gill organized American Insurers Life Insurance Company in 1958 and was originally the sole contributor of its capital assets. At Gill's death in 1960 the company was insolvent, at least in the sense of being unable to meet its current obligations. A foreclosure proceeding was pending against the Mississippi land—the corporation's principal asset. The comparatively small sum of $17,892.23 was needed to pay delinquent items then due upon mortgage indebtednesses totaling $262,519.89.

It is fairly inferable that Gill, as president of the company, had not kept his fellow officers and directors fully informed about the Mississippi foreclosure suit. We may suppose that Gill had some plan for averting the foreclosure, but his death leaves that matter in a state of uncertainty.

Gill died on June 12, 1960. One of the appellants, Walter H. Patton, was elected to succeed him as president of the company. A few days later Patton and another director, J. E. Stevenson, Jr., were both in Mississippi. Stevenson, Gill's brother-in-law, was an Arkansas real estate dealer with whom the lands had been listed for sale at an asking price of $350,000. He testified that it was not until June 23 that he learned that a public foreclosure sale was scheduled to take place on June 25. He and Patton began desperate efforts to find some last-minute means of averting the sale.

The two men telephoned E. M. Regenold, a close friend who was president of a bank in Blytheville, Arkansas. After much discussion Regenold agreed to lend American Insurers the needed $17,892.23, with the debt to be evidenced by a promissory note bearing interest at 6% per annum. As security for the note American Insurers agreed (a) to assign to Regenold the net proceeds of an insurance policy on Gill's life, (b) to assign to Regenold the rents from part of the Mississippi lands, (c) to give Regenold a note for $10,000, to be

executed by Stevenson, and (d) to give Regenold a "commission" of half the net proceeds of the sale of the Mississippi land, after the payment of the mortgage indebtedness and expenses of sale. On the basis of the telephone conversations Regenold sent a cashier's check to Patton and Stevenson, which reached them only minutes before the foreclosure sale would have been held. Regenold's attorney promptly drafted a resolution embodying the terms of the loan contract, which the directors of American Insurers adopted on June 30. The corporation also executed its note for $17,-892.23, which was actually paid within a few months from the Mississippi rents. In 1963 American Insurers, which was then in liquidation, sold the Mississippi lands for $567,131.25. After the payment of the debts against the land and of the sum of $133,804.38 as a compromise settlement with tenants who had an option to purchase the land themselves, there remained the net proceeds of sale upon which the chancellor based his decree in favor of the appellee.

At the outset we disallow the appellee's contention that the transaction was a "joint venture" rather than a simple loan of money. We find no resemblance between the contract, as described by Regenold's own attorney, and a joint venture or partnership agreement. Regenold took no risk in the sense of advancing money that might be lost if the supposed venture proved a failure. Regenold simply lent the sum of $17,892.23 upon security so sound that the principal debt was actually repaid before December 1, 1960. Both Patton's contemporaneous letter to Regenold, outlining the terms of the contract, and the corporate resolution prepared by Regenold's lawyer, referred to the advance of funds as a loan. It is true that Patton's letter described Regenold's share of the net proceeds of sale as a "commission," and that the corporate resolution recited that the payment was to be made "in consideration of services rendered and assistance given to this corporation by the said F. M. Regenold in connection with the sale of certain lands owned by this corporation" in Mis-

sissippi. There is no contention whatever by the appellee that his father was entitled to a commission for helping to sell the Mississippi property, because E. M. Regenold was not a licensed real estate broker either in Arkansas or in Mississippi and hence could not legally have contracted for a broker's commission in either state. The undisputed truth is that Regenold's sole contribution to the transaction was a loan of money, leaving no sound basis for the argument that some sort of joint venture existed.

We come, then, to the pivotal issue of usury. Contracts by which the lender acquires a right to a speculative profit in place of or in addition to a fixed rate of interest ordinarily present an issue of fact on the question of usury. Needless to say, if the lender bargains for the possibility of a profit in addition to the highest permissible rate of interest, the transaction is usurious. *Sosebee* v. *Boswell*, 242 Ark. 396, 414 S. W. 2d 380 (1967). At the other extreme, there is ordinarily no basis for a finding of usury when the one who advances the money takes the risk of losing both principal and interest if the venture fails. See Williston, Contracts, § 1692 (Rev. Ed. 1938); *Andrews* v. *Andrews*, 170 Minn. 175, 212 N. W. 408, 51 A. L. R. 542 (1927).

With respect to the particular fact situation now before us, which falls between the two extremes just mentioned, we approve—with special emphasis on the final sentence—the following paragraph from the Restatement of Contracts, § 527 (1932):

"Usury laws do not forbid the taking of business chances in the employment of money. A creditor who takes the chance of losing all or part of the sum to which he would be entitled if he bargained for the return of his money with the highest permissible rate of interest is allowed to contract for greater profit. On the other hand it is not permissible to use this form of contract as a device for obtaining usurious profit. If the prob-

ability of the occurrence of the contingency on which diminished payment is promised is remote, or if the diminution should the contingency occur is slight as compared with the possible profit to be obtained if the contingency does not occur, the transaction is presumably usurious.''

Regenold exacted from the debtor a contract by which both the principal and interest of the loan were amply secured. At most Regenold gave up the difference between interest at 6% upon a note due in six months and interest at 10% upon the same note—a sum amounting to about $350. (Under Mississippi law the maximum interest rate would have been 8%, but the appellee does not argue that the result under the Mississippi decisions would be more favorable to him than that under Arkansas law.) By contrast, Regenold's probable profit would be so decidedly disproportionate to the pittance he gave up as to bring the case within the Restatement's declaration that the contract is ''presumably usurious.''

We do not agree with the appellee's insistence that there is ''no evidence of any kind'' as to the market value of the Mississippi lands on June 25, 1960—the date of the oral agreement. To the contrary there is an abundance of proof indicating that Regenold's expected profit would far exceed the trivial additional interest he might lawfully have demanded. The total mortgage debt against the lands was $262,519.89. Stevenson, who had the lands listed for sale at $350,000, unquestionably assured Regenold that the profit clause in the agreement would result in a substantial return. Before the loan was paid in November, Patton sent Regenold a statement (appearing as Exhibit 32) in which he estimated the debtor's equity to be $100,000. Within less than 65 days after the loan was made American Insurers rejected an offer of $325,000 for the property. Regenold was apparently anxious for the company to accept that offer and expressed his willingness to advance an additional $53,-000 to consummate the transaction. In December of 1960 the tenants on the land were given an option to

purchase it for $350,000. Finally, less than three years after Regenold made the loan the land was actually sold for $567,131.25. On the proof as a whole we are forced to conclude that Regenold, while taking no substantial risk of losing either the principal or the interest of the loan, demanded in addition a reasonably certain profit so completely in excess of legal interest as to constitute usury. The chancellor was in error in not so holding.

Reversed.

FOGLEMAN, J., disqualified.