**BLAYLOCK INVESTMENT COR-
PORATION**

v.

**STANDARD TITLE INSURANCE
COMPANY.**

Civ. A. No. 14487.

United States District Court,
W. D. Louisiana,
Shreveport Division.

June 2, 1971.

Cecil E. Ramey, Jr., Thomas J. Wyatt, Hargrove, Guyton, Van Hook & Ramey, Shreveport, La., for plaintiff.

Charles H. Ryan, Boles & Ryan, Monroe, La., Isaac A. Scott, Jr., Little Rock, Ark., for defendant.

## OPINION

DAWKINS, Chief Judge.

This diversity action, which was removed from the First Judicial District Court, Caddo Parish, Louisiana, arises out of the issuance of a policy of title insurance by Standard Title Insurance Co., to Blaylock Investment Corporation (Blaylock). The risk (or peril) insured against relevant to this litigation is set forth in the policy as "the invalidity or unenforceability of the lien of the mortgage upon said estate. . . ."

Blaylock was granted a mortgage (deed of trust) on some fifty-one lots which were to be developed into a residential subdivision in Arkansas. The background of that transaction is set forth in detail in Sosebee v. Boswell, 242 Ark. 396, 414 S.W.2d 380 (1967), a decision of the Arkansas Supreme Court holding that the mortgage transaction was null, as "a clear-cut case of usury." In general, that case discloses that Blaylock, in addition to receiving interest upon its loan, secured an "escrow agreement" by which it was granted the possibility of securing further sums upon the sale of each lot. The agreement is set forth in Sosebee v. Boswell, *supra*, at 381–382.

The single issue before us is whether the failure of the mortgage lien, under all the circumstances of the transaction, was a risk insured by the policy.[1] Plaintiff claims the risk was insured and bases this contention on (1) the policy as written and (2) alternatively, reformation of the written contract. Defendant denies liability.

## POLICY AS WRITTEN

As noted, the policy insures, among other contingencies, the risk of "invalidity or unenforceability of the lien of the mortgage upon said estate." As is customary, however, the insured risk is limited by conditions, stipulations, or exclusions. Defendant relies, *inter alia*, upon the following policy provision:

"3. Exclusions from the Coverage of this Policy.

This policy does not insure against loss or damage by reason of the following:

\*    \*    \*    \*    \*    \*

(f) Usury or claims of usury not shown by the public records."

Plaintiff first argues that this exclusion, as well as the other "Conditions and Stipulations," because of the manner in which the several risks insured under the policy are delineated, is not applicable. Blaylock asserts,

"For the present purposes we are concerned with the first insuring agreement, the second peril of which covers 'the *invalidity or unenforceability* of the lien of the mortgage.' Of the eight perils insured, some are specifically limited by the language 'not . . . excluded from coverage in the conditions and stipulations.' The second peril is not so limited. At the end of the listing of the eight insured perils and after the second insuring agreement is set forth, it is said 'all subject to the provisions of Schedules A and B and to the Conditions and Stipulations.' The question is why were the exclusions referred to in two perils and not

---

1. While in diversity matters the threshold question is generally choice of law, we do not find it necessary to enumerate and apply those principles here. There are no cases in either Arkansas or Louisiana or in any other jurisdiction dealing with the present problem. Counsel for plaintiff as well as counsel for defendant agree that both Louisiana and Arkansas adopt the same general principle of insurance contract interpretation. Choice of law does not control any disposition here made and lengthy discussion thereof would be superfluous and contribute needlessly to the already confused area. *See,* Lester v. Aetna Life Insurance Co., 295 F.Supp. 1208 (W.D.La.1968); affirmed on different grounds ("false conflicts") 433 F.2d 884 (5th Cir. 1970); Johnson v. St. Paul Mercury, 256 La. 289, 236 So.2d 216 (1970). See also, Couch, "Choice of Law," 45 Tul.L.Rev. 100 (1970); Franklin v. Texas International Petroleum Corp., 324 F.Supp. 808 (W.D.La., 1971).

in the other six if the exclusions by virtue of the general closing language are to apply to all eight perils? They would not. Therefore the exclusions (Paragraph 3) do not apply to the six perils in which they are not referred to."

The answer to plaintiff's argument seems obvious from a reading of the clear language of the policy. In those two risks which specifically refer to the conditions and stipulations, both provide for further contractual exclusions depending upon the unique condition of the property (e. g., prior lien, etc.). Schedule B which provides a blank space for the addition of further nonstandard exclusions is referred to in both instances. It is obvious that the reason the additional reference to "Conditions and Stipulations" is made in those instances is to avoid the contention that Schedule B provides the *only* exclusions, conditions, or stipulations with respect to the two risks.

We find no ambiguity here. After delineating the risks insured, the policy further provides they are "all subject, however, to the provisions of Schedules A and B and to the 'Conditions and Stipulations' hereto annexed." Plaintiff's contention that the "Conditions and Stipulations" do not apply here clearly is without merit.

■ We further find that it is not necessary to consider any of the exclusions other than 3(f).[2] Plaintiff argues that, because defendant had *actual* knowledge of the "escrow agreement" which resulted in the usury situation, Exclusion 3(f) should not and does not

control. No authority to that effect has been presented and we must reject that contention. As noted, there is no ambiguity involved here. The exclusion clearly exempts coverage for "[u]sury or claims of usury not shown by the public records." We find no basis to convert that clear language to cover this situation where the "escrow agreement" was not recorded even assuming, *arguendo*, that defendant had actual knowledge of the agreement.

There is no evidence that plaintiff intended the insurance policy in any way to relate to the "escrow agreement." That agreement was instigated by Blaylock for its own benefit. There is no evidence that Blaylock was interested in securing insurance relating to the effect that agreement might have. We cannot read the clear language of the policy to mean, or reasonably to lead Blaylock to understand it to mean, other than as written "[u]sury or claims of usury *not shown by the public records*." We cannot distort that language to require reliance on the public records by Blaylock or to find that defendant should be barred from invoking this exclusion because its wholly owned subsidiary "controlled" recordation. There is no evidence whatsoever that Blaylock desired to have this letter agreement recorded or that it relied upon anyone to file the letter in the public records.

We think Blaylock's action in not requesting representation or assistance from defendant in defending the case in the Arkansas Court strongly confirms the conclusion that it did not at that time contemplate the claim of usury to

---

2. Defendant relies also on 3(d) (1) and 3(d) (2):

"This policy does not insure against loss or damage by reason of the following:

\*     \*     \*     \*     \*

"(d) Defects, liens, encumbrances, adverse claims against the title as insured or *other matters* (1) created, suffered, assumed or *agreed to by the Insured* claiming loss or damage; or (2) *known* to the Insured Claimant at the date such Insured Claimant ac-

quired an estate or interest insured by this policy and not known to the Company *or not shown by the public records*." (Emphasis added.)

Paragraph 3(f) being directly applicable here, we do not find it necessary to consider these exclusions.

Defendant further relies on lack of notice of the claim and estoppel as defenses. Both of the defenses are patently without merit as plaintiff has ably pointed out in its brief.

be covered under the clear language of the policy.

Accordingly, we hold that Paragraph 3(f) of the "Conditions and Stipulations" bars recovery here under the policy as written.

## REFORMATION

■ Plaintiff argues this is a clear case for reformation based on the writings and actions of defendant's officers and the president of its agent and subsidiary. Reformation is an equitable remedy. The general rule is expressed in Annot. 32 A.L.R.3d 661, 674 (1970).

> "An action for reformation of an insurance policy may be brought where an insured alleges that he had applied for coverage against certain risks or causes of loss and, although he had reason to believe he had obtained the desired coverage, he discovered after a loss that the policy as issued did not by its terms, provide such coverage.
>
> . . .
>
> "The general principles applicable to reformation of contracts are applicable to insurance contracts, so that where, by reason of mutual mistake, mistake of the insurer, or fraud, the policy as written does not express the true agreement of the parties, it may be reformed so as to express the actual contract intended by the parties."

The Louisiana courts have expressed this rule as follows: [3]

> "Reformation of an insurance policy may be had, in general, where by reason of fraud, inequitable conduct or mutual mistake, the policy as written does not express the actual and real agreement of the parties. More particularly, if by inadvertence, accident, or mistake the terms of a contract of insurance are not fully or correctly set forth in the policy, it may be reformed in equity so as to express the actual contract intended by the par-

ties, if the mistake is mutual or if there has been fraud or inequitable conduct by one of the parties to the contract." Maryland Casualty Co. v. Kramel, 80 So.2d 897, 899 (La.App.2d Cir.1955). *See also,* Urania Lumber Company v. Insurance Co. of North America, 177 So.2d 640 (La.App.2d Cir.1965).

■ We hold that plaintiff has failed to carry its burden of establishing by adequate proof grounds for reformation of the policy. The only evidence regarding an intent to insure against the risk of usury is the language of the policy itself which expressly *excepts* coverage of usury or claims of usury not shown by the public records. No evidence supports plaintiff's claim that it intended to have the risk of usury resulting from the letter-"escrow agreement" covered by the policy. There is no evidence that there was any concern on Blaylock's part about usury coverage at all. Of course, plaintiff did have a clear general intent to insure against "the invalidity or unenforceability of the lien of the mortgage. . . . "

For purposes of reformation, however, we think it necessary to prove specific intent to insure against the particular risk here involved—*i. e.,* failure of lien due to usury based on the non-recorded instrument. We repeat, there is no evidence that Blaylock thought the letter-agreement would be recorded or that it relied on anyone under defendant's control or related to it to do so. While there is little doubt that the parties involved were aware of the existence of the "escrow agreement," there is no evidence that anyone considered it was related to risks insured thereunder.

This is not a case of an uninitiated layman dealing with an insurance company expert in this field. Blaylock in its normal course of business annually deals in hundreds of thousands of dollars of loans and secures numerous title

---

3. The availability of remedies is controlled by the law of the forum. *See, e. g.,* Central Vermont R. Co. v. White, 238 U.S. 507, 35 S.Ct. 865, 59 L.Ed. 1433 (1915); Matney v. Blue Ribbon, Inc., 202 La. 505, 12 So.2d 253 (1942); Missouri P. R. Co. v. Diffee, 212 Ark. 55, 205 S.W.2d 458 (1947).

policies. It has specialized personnel, possessing expertise in this field, to deal with such matters. The clear language of the policy excepts claims of usury not reflected in the public record. If it had a special, or even general, concern in this area, it plainly was knowledgeable enough to request that the agreement be recorded.[4] The parties here were on a wholly equal footing.

Accordingly, the prayer for equitable reformation is denied.

Plaintiff's demands, accordingly, must be rejected. A proper decree should be presented by defendant, after approval as to form by plaintiff, within ten days.

4. Subsequent to the issuance of this policy, the exclusion of claims of usury has been made absolute by the American Land Title Association.